**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 23, 2004**


**RICHARD ADAM KREINER,**

    **Plaintiff-Appellee,**

**v**                    **No. 124120**

**ROBERT OAKLAND FISCHER,**

    **Defendant-Appellant.**

_____

**DANIEL LEE STRAUB,**

    **Plaintiff-Appellee,**

**v**                    **No. 124757**

**PHILLIP MICHAEL COLLETTE and**
**TERESA M. HEIL-WYLIE,**

    **Defendants-Appellants.**

_____

**BEFORE THE ENTIRE BENCH**

**TAYLOR, J.**

In these consolidated cases, we granted leave to appeal to consider whether plaintiffs satisfy the "serious impairment of body function" threshold set by the no-fault insurance act in order to be able to maintain an action for

noneconomic tort damages.  See MCL 500.3135(1).  The trial courts granted defendants' motions for summary disposition, concluding that neither plaintiff has suffered a "serious impairment of body function."  The Court of Appeals reversed.[1]  Because we conclude that plaintiffs do not satisfy the "serious impairment of body function" threshold, we reverse the judgments of the Court of Appeals and reinstate the trial courts' orders granting summary disposition for defendants.

## I. Origin and Development of the No-Fault Act

Before 1973, actions seeking damages for injuries resulting from motor vehicle related accidents proceeded, for the most part, pursuant to common-law accident principles in Michigan's courts.  However, with the enactment of the no-fault act, 1972 PA 294, effective October 1, 1973, the Legislature abolished tort liability generally in motor vehicle accident cases and replaced it with a regime that established that a person injured in such an accident is entitled to certain economic compensation from his own insurance company regardless of

---

[1] *Straub v Collette*, 254 Mich App 454; 657 NW2d 178 (2002), vacated and remanded 468 Mich 920 (2003), *(On Remand),* 258 Mich App 456; 670 NW2d 725 (2003). *Kreiner v Fischer*, 251 Mich App 513; 651 NW2d 433 (2002), vacated and remanded, 468 Mich 885 (2003), *(On Remand),* 256 Mich App 680; 671 NW2d 95 (2003).

fault. Similarly, the injured person's insurance company is responsible for all expenses incurred for medical care, recovery, and rehabilitation as long as the service, product, or accommodation is reasonably necessary and the charge is reasonable. MCL 500.3107(1)(a). There is no monetary limit on such expenses, and this entitlement can last for the person's lifetime. An injured person is also entitled to recover from his own insurance company up to three years of earnings loss, i.e., loss of income from work that the person would have performed if he had not been injured. MCL 500.3107(1)(b).[2] An injured person can also recover from his own insurance company up to twenty dollars a day for up to three years in "replacement" expenses, i.e., expenses reasonably incurred in obtaining ordinary and necessary services that the injured person would otherwise have performed. MCL 500.3107(1)(c).

In exchange for the payment of these no-fault economic loss benefits from one's own insurance company, the Legislature limited an injured person's ability to sue a

---

[2] There is a cap on the amount recoverable in a thirty-day period, which cap is adjusted annually for changes in the cost of living. We are advised that the work loss cap for accidents occurring between October 2002 and September 2003 was $4,070. An injured person may file a tort claim against the party at fault seeking to recover *excess* economic losses (wage losses and replacement expenses beyond the daily, monthly, and yearly maximum amounts). MCL 500.3135(3)(c).

negligent operator or owner of a motor vehicle for bodily injuries. In particular, the Legislature significantly limited the injured person's ability to sue a third party for noneconomic damages, e.g., pain and suffering. No tort suit against a third party for noneconomic damages is permitted unless the injured person "has suffered death, serious impairment of body function, or permanent serious disfigurement."[3] MCL 500.3135(1).

Following enactment of the no-fault act, Governor Milliken requested of this Court an advisory opinion regarding the act's constitutionality. We issued such an opinion in *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441; 208 NW2d 469 (1973), holding that the significant wording of the statute—"serious impairment of body function" and "permanent serious disfigurement"— provided standards sufficient for legal interpretation. We also held that the fact-finding related to these standards was within the province of the jury rather than a judge.

This Court next addressed the no fault act in *Shavers v Attorney General*, 402 Mich 554; 267 NW2d 72 (1978). We held that the act was a proper exercise of the police power

---

[3] It is also the case that a party is foreclosed from recovery of noneconomic loss if the person is more than fifty percent at fault, MCL 500.3135(2)(b) and (4)(a), or if the person was operating his own vehicle while uninsured, MCL 500.3135(2)(c).

4

and that the legislative scheme did not offend either the due process or equal protection guarantees of the Michigan Constitution. We did, however, find the rate-making procedure of the act unconstitutional and allowed the Legislature eighteen months to correct it. As our subsequent order in *Shavers* demonstrates, the Legislature did correct it through 1979 PA 145 and 1979 PA 147. 412 Mich 1105 (1982). We also discussed in *Shavers* the compromise rationale of the act:

> The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses. The Legislature believed this goal could be most effectively achieved through a system of compulsory insurance, whereby every Michigan motorist would be required to purchase no-fault insurance or be unable to operate a motor vehicle legally in this state. Under this system victims of motor vehicle accidents would receive insurance benefits for their injuries as a substitute for their common-law remedy in tort.
>
> . . . The act's personal injury protection insurance scheme, with its comprehensive and expeditious benefit system, reasonably relates to the evidence advanced at trial that under the tort liability system the doctrine of contributory negligence denied benefits to a high percentage of motor vehicle accident victims, minor injuries were over-compensated, serious injuries were undercompensated, long payment delays were commonplace, the court system was overburdened, and those with low income and little education suffered discrimination. [402 Mich 578-579.][4]

---

[4] We later discussed this compromise concept further in *Cassidy v* McGovern, 415 Mich 483, 500; 330 NW2d 22 (1982),

Six years later, after the phrase "serious impairment of body function" and other phrases in the act, such as "permanent serious disfigurement," had been placed before juries as questions of fact pursuant to the 1976 advisory opinion, this Court in *Cassidy v* McGovern, 415 Mich 483; 330 NW2d 22 (1982), retrenched on whether these were issues for the jury. In *Cassidy* we held that opinions requested under Const 1963 art 3, § 8 are only advisory and not precedential and that revisiting the issue was advisable where the Court had before it actual adverse parties to an existing controversy. The *Cassidy* Court again reiterated the general understanding this Court had of the no-fault act—namely that it was a compromise encompassing the notion of a certain recovery for economic loss in return for

where we quoted from 7 Am Jur 2d, Automobile Insurance, § 340, p 1068:

> "It has been said of one such plan that the practical effect of the adoption of personal injury protection insurance is to afford the citizen the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses * * *. In return for this he surrenders the possibly minimal damages for pain and suffering recoverable in cases not marked by serious economic loss or objective indicia of grave injury, and also surrenders the outside chance that through a generous settlement or a liberal award by a judge or jury in such a case he may be able to reap a monetary windfall out of his misfortune."

reduced tort suit opportunities for noneconomic loss. The Court said:

> At least two reasons are evident concerning why the Legislature limited recovery for noneconomic loss, both of which relate to the economic viability of the system. First, there was the problem of the overcompensation of minor injuries. Second, there were the problems incident to the excessive litigation of motor vehicle accident cases. Regarding the second problem, if noneconomic losses were always to be a matter subject to adjudication under the act, the goal of reducing motor vehicle accident litigation would likely be illusory. The combination of the costs of continuing litigation and continuing overcompensation for minor injuries could easily threaten the economic viability, or at least desirability, of providing so many benefits without regard to fault. If every case is subject to the potential of litigation on the question of noneconomic loss, for which recovery is still predicated on negligence, perhaps little has been gained by granting benefits for economic loss without regard to fault. [*Cassidy, supra* at 500.]

Further, the Court rejected its *Advisory Opinion* conclusion that juries should find facts and held that trial judges were to decide, as a matter of law, whether the plaintiff had suffered a serious impairment of body function when there was no factual dispute about the nature and extent of the plaintiff's injuries, or when there was a dispute, but it was not material to the determination whether the plaintiff had suffered a serious impairment of body function. Next, the Court held, without reference to textual support but in an apparent effort to effectuate the

"goal of reducing motor vehicle accident litigation," that to satisfy the "serious impairment" threshold, an "important" body function must be impaired, that the injury must be an "objectively manifested injury", and that the injury must have an effect "on the person's general ability to live a normal life." *Id*. at 505.[5] The Court, in reading this language into the act, clearly intended its holding to assist in making the compromise at the heart of the no-fault act viable. This judicially created formula, or

---

[5] The *Cassidy* Court stated:

. . .impairment of body function is better understood as referring to important body functions.

. . . We believe that the Legislature intended an objective standard that looks to the effect of an injury on the person's general ability to live a normal life. . . .

Another significant aspect of the phrase "serious impairment of body function" is that it demonstrates the legislative intent to predicate recovery for noneconomic loss on objectively manifested injuries. Recovery for pain and suffering is not predicated on serious pain and suffering, but on injuries that affect the functioning of the body. . . .

\* \* \*

. . . we conclude that an injury need not be permanent to be serious. Permanency is, nevertheless, relevant. (Two injuries identical except that one is permanent do differ in seriousness.) [*Id*. at 504-506.]

gloss, in fact became the central inquiry for a court to resolve when a plaintiff alleged that the tort threshold for a third-party tort suit had been met.

Yet, four years after *Cassidy* was decided, and interestingly after four new justices joined the Court, in *DiFranco v Pickard*, 427 Mich 32, 50-58; 398 NW2d 896 (1986)[6], the Court overruled *Cassidy* in several particulars as to how the "serious impairment" issue should be interpreted and applied. First, the Court found no textual authority for the notion that "serious impairment" was not to be decided as a matter of law and overruled *Cassidy* in that regard. Next, *DiFranco,* using a textualist approach, rejected the *Cassidy* requirement that an "important" body function had to be impaired, concluding that there was no such requirement in the statutory language. *Id.* at 39. Similarly, *DiFranco* rejected the *Cassidy* "objectively manifested injury" requirement—as it had been subsequently construed in *Williams v Payne*, 131 Mich App 403; 346 NW2d 564 (1984), to not include objectively manifested symptoms—

---

[6] The *Cassidy* majority opinion was signed by Justices Fitzgerald, Williams, Ryan, Coleman, and Levin. Justice Kavanagh concurred in part and dissented in part. Justice Riley did not participate. The *DiFranco* majority opinion was signed by four new justices: Cavanagh, Brickley, Boyle, and Archer. Justices Williams, Levin, and Riley concurred in part and dissented in part. Justices Williams and Riley complained that the majority was overruling *Cassidy* only four years after it was decided.

on the basis that it had proved to be an almost insurmountable obstacle to recovery of noneconomic damages in soft-tissue injury cases. *DiFranco, supra* at 40, 73. Indeed, the Court believed that, as interpreted, this requirement was limiting recovery only to catastrophically injured persons. *Id.* at 45. Next, *DiFranco* discarded the "general ability to live a normal life" test because, as the Court characterized it, there is no such thing as "a normal life." Moreover, the Court believed that this standard was flawed because of the practical, if debatable, proposition that it had proved an almost insurmountable obstacle to recovery of noneconomic damages. *Id.* at 39, 66.

Having dispatched the bulk of the *Cassidy* standards, the *DiFranco* Court held that the phrase "serious impairment of body function" involved two inquiries: (1) "What body function, if any, was impaired because of injuries sustained in a motor vehicle accident?" and (2) "Was the impairment serious?" *Id*. at 39, 67. Next, the Court readopted the old *Advisory Opinion* rule that the serious impairment issue was to be decided by a jury whenever reasonable minds could differ on the issue even if there were no material factual dispute about the nature or extent of the injuries. *Id.* at 38. Finally, *DiFranco* said that

the jury should consider such factors as "the extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors." *Id.* at 39-40, 69-70.

This resolution produced sufficient dissatisfaction to the extent that eventually, in 1995, a bill was placed before the Legislature to reform the 1972 act. As enacted, the bill was 2 ½ pages long. The relevant goal of the 1995 bill was "to modify tort liability arising out of certain accidents." Notably, the bill amended only § 3135 of the voluminous 1972 act. As passed and signed by the Governor, the amendment required courts to decide the "serious impairment of body function" issue if "[t]here is no factual dispute concerning the nature and extent of the person's injuries," or if there is a factual dispute, but it is not material to the determination whether the person has suffered a serious impairment of body function. MCL 500.3135(2)(a)(i), (ii). Second, "serious impairment of body function" was defined as

> an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life. [MCL 500.3135(7).]

This means then that pursuant to the Legislature's directives embodied in the 1995 amendment, "serious

11

impairment of body function" contains the following components: an objectively manifested impairment, of an important body function, and that affects the person's general ability to lead his or her normal life.[7] Furthermore, courts, not juries, should decide these issues.[8]

Plaintiffs and their proponents argue that after 1995 it is only necessary to show that there has been an impairment of an important body function that, in some way,

---

[7] While *Cassidy, supra* at 505, required an evaluation of the effect of an injury on the person's general ability to live "a normal life," the *DiFranco* Court concluded that it was impossible to objectively determine what "a normal life" is, asserting: "there is no such thing as 'a normal life.'" *DiFranco, supra* at 66. Apparently cognizant of this comment, and attempting to reconcile the incongruity that *DiFranco* had pointed out, the Legislature, in the 1995 act, requires that the impairment affect "the person's general ability to lead *his or her* normal life." (Emphasis added.) It is then clear that, harkening to the *DiFranco* Court's guidance that there is no objectively "normal life," the Legislature modified the entirely objective *Cassidy* standard to a partially objective and partially subjective inquiry. Thus, what is "normal" is to be determined subjectively on the basis of the plaintiff's own life and not the life of some objective third party. However, once that is fixed as the base, it is to be objectively determined whether the impairment in fact affects the plaintiff's "general ability to lead" that life.

[8] As should be evident, and as previous panels of the Court of Appeals have noted, the most uncomplicated reading of the 1995 amendment is that the Legislature largely rejected *DiFranco* in favor of *Cassidy*. See, e.g., *Jackson v Nelson*, 252 Mich App 643, 649-650; 654 NW2d 604 (2002), and *Miller v Purcell*, 246 Mich App 244, 248; 631 NW2d 760 (2001).

influences, touches or otherwise affects the plaintiff's lifestyle, *regardless of degree*. If some effect has been demonstrated, the new legislative test is satisfied, *regardless of the extent of the effect*. (Emphasis added).[9]

Defendants and their amicis, on the other hand, contend that a plaintiff must demonstrate not simply that some aspect of his life has been affected, but that *generally* he is no longer able to lead his normal life.

## II. Facts and Proceedings Below

### A. *Straub v Collette*

Daniel Straub injured three fingers on his nondominant hand when his motorcycle collided with an automobile on September 19, 1999. He suffered a broken bone in his little finger and injured tendons in his ring and middle fingers. Straub underwent outpatient surgery on September 23, 1999, to repair the tendons. No medical treatment was required for the broken bone. He wore a cast for about one month following surgery to assist the healing of the tendons. He also took prescription pain medication for about two weeks following the surgery and completed a physical therapy program.

About two months following the surgery, Straub's doctor noted that Straub's injuries were healing nicely.

---

[9] Sinas & Ransom, <u>The 1995 no-fault tort threshold: A statutory hybrid</u>, 76 Mich Bar J 76 (1997).

Around the same time, Straub returned to work as a cable lineman for a cable television company, initially working twenty to twenty-five hours a week, but returning to full-time work about three weeks later, on December 14, 1999. He testified at his deposition that since returning to work, he was able to perform all his job duties, but sometimes with discomfort. In addition, he testified that until late December 1999, he had difficulty doing household chores, such as washing dishes, doing yard work, and making property repairs. He was also unable to operate his archery shop during the hunting season in the fall of 1999. Operating his shop required him to repair bows, make arrows, and process deer meat. In mid-January 2000, however, he was able to resume playing bass guitar in a band that performed on weekends. By the time of Straub's deposition, he could perform all the activities in which he had engaged before the accident, although he was still unable to completely straighten his middle finger. He was also still unable to completely close his left hand, which decreased his grip strength.

Straub filed an action in circuit court to recover noneconomic damages under the no-fault act. The trial court granted defendants' motion for summary disposition, finding that Straub's injuries relate only to "extrinsic"

considerations such as playing guitar and processing deer meat, and thus did not meet the threshold of "serious impairment of body function."  MCL 500.3135(7).

The Court of Appeals reversed, holding that, between the date of the accident and mid-January 2000, Straub's injuries affected his "general ability to lead his normal life," and, thus, Straub satisfied the serious impairment threshold.  *Straub v Collette*, 254 Mich App 454, 459; 697 NW2d 178 (2002).  The Court reasoned that Straub was unable to play bass guitar in his band for approximately four months after the accident and that, before the accident, he performed almost every weekend and practiced several times each week.  It also concluded that four months was a significant amount of time during which Straub was unable to play the guitar.  The panel further reasoned that Straub was unable to engage in full-time employment for about three months.  The Court concluded that, for a limited amount of time, Straub's injuries affected his general ability to lead his normal life, "particularly his ability to perform musically and to work."  *Id*.

Thereafter, defendants filed an application for leave to appeal in this Court.  On June 12, 2003, this Court entered an order vacating the judgment of the Court of Appeals and remanding this case to the Court of Appeals for

consideration in light of this Court's order in *Kreiner v Fischer*, 468 Mich 885 (2003). *Straub v Collette*, 468 Mich 920 (2003).

On remand, the Court of Appeals again reversed. *Straub v Collette (On Remand)*, 258 Mich App 456; 670 MW2d 725 (2003). The Court again concluded that Straub's injuries affected his ability to play the guitar and to work. The Court determined that Straub's injuries affected his ability to perform household tasks and to operate his archery shop. Thus, the Court of Appeals concluded that Straub's injuries affected his ability to lead his normal life, "given the work and tasks that he performed before the accident . . . ." *Id*. at 463. We subsequently granted leave to appeal. 469 Mich 948 (2003).

### B. *Kreiner v Fischer*

On November 28, 1997, plaintiff Kreiner was injured in an automobile accident. Four days after the accident he visited his family doctor, complaining of pain in his lower back, right hip, and right leg. The doctor ordered x-rays and cortisone injections for pain. Kreiner returned to his doctor three days later and complained that the pain was persisting. The doctor administered another cortisone injection and prescribed physical therapy and pain medication.

When Kreiner complained that his pain continued six weeks after the accident, his doctor referred him to a neurologist, Karim Fram, M.D., who conducted an electromyography (EMG)[10] that revealed mild nerve irritation to the right fourth lumbar (L4) nerve root in Kreiner's back and degenerative disc disease with spondylolisthesis.[11] Dr. Fram prescribed Motrin for pain along with a muscle relaxant, and instructed Kreiner to perform certain back and muscle strengthening exercises at home.

Kreiner returned to Dr. Fram in May 1998 complaining of pain radiating from the back of his right thigh and right calf, which pain was aggravated by bending over and either sitting or standing for any length of time. Dr. Fram prescribed pain medication and a continued program of back and muscle strengthening exercises. In August 1998, after Kreiner returned and complained of constant lower back pain aggravated by climbing, bending over, pushing, and pulling, Dr. Fram prescribed a three-week physical

---

[10] EMG testing is a process by which impairment to nerves in the arms and hands may be verified objectively. It involves measuring and analyzing the responses of muscles to stimulation by electricity. *Dorland's Illustrated Medical Dictionary* (28th ed, 1994), p 537.

[11] Spondylolisthesis is the "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it . . . ." *Stedman's Medical Dictionary* (26th ed, 1995), p 1656.

therapy course.  In October 1998, Dr. Fram again prescribed an anti-inflammatory medication and home exercises.

Dr. Fram's notes reveal that plaintiff visited him in August 1999 for a follow-up examination.  At that time, Kreiner was still complaining of continuous pain in his lower back and of right leg pain radiating to the lower extremities on the right side.  Standing, lifting, climbing a ladder, and staying in one position for a long time tended to aggravate the pain.  Dr. Fram advised Kreiner to continue the home exercises, to use a back support during daily activity, to avoid lifting objects over fifteen pounds, and to refrain from excessive bending or twisting. Dr. Fram also prescribed a mild muscle relaxant.  Kreiner subsequently stopped treating with any physician and stopped taking medications.

Before and after the accident, Kreiner worked as a self-employed carpenter and construction worker performing home remodeling, such as building decks, doing electrical work, and performing plumbing, siding, and some mechanical work.  After the accident, he could no longer work eight-hour days as he had previously.  He was forced to limit his workday to only six hours.  Kreiner said he was also unable to stand on a ladder longer than twenty minutes at a time, could no longer perform roofing work, and was unable to

18

lift anything over eighty pounds.[12]  He also could no longer walk more than half a mile without resting and could no longer hunt rabbits.  He could, however, continue to hunt deer.

In October 1998, Kreiner filed a complaint against Fischer, seeking noneconomic damages under MCL 500.3135. The trial court granted Fischer's motion for summary disposition, finding that Kreiner failed to satisfy the "serious impairment of body function" threshold.  The trial court stated in part:

> While somewhat restricted, the Plaintiff in this case is able to engage in lifting, bending, twisting, and standing that is required by his job.  Furthermore, he continues to engage in his favorite recreational activity which is hunting.
>
> Based on these facts, Plaintiff is hard-pressed to show how his alleged impairment is serious enough to affect his normal life.
>
> Further, the Court finds that under the factors enumerated in *Harris* [*v Lemicex*, 152 Mich App 149; 393 NW2d 559 (1986)], the claimed injury is not serious.  Here, Plaintiff's treatment is limited to wearing a back support garment and taking muscle relaxants and painkillers.  He has not been actually physically disabled at any time, and the duration of his injury is intermittent.
>
> Finally, his own doctor has stated that there is a chance that the damaged root will heal completely.

---

[12] Despite his limitations, Kreiner's tax returns revealed that 1998 was his highest income-earning year, including several years before the injuries occurred.

> For these reasons, the Court finds as a matter of law the impairments for which Plaintiff claims he suffers from do not impinge in any real sense in his ability to lead a normal life. Therefore, he is not entitled to maintain this action in tort against the Defendant under the No-Fault Statute, MCL 500.3135(1).

The Court of Appeals reversed the trial court's decision. *Kreiner v Fischer*, 251 Mich App 513; 651 NW2d 95 (2002). The Court determined that the trial court erred by finding that Kreiner's impairment was not "serious enough" because MCL 500.3135(7) does not require a showing of seriousness. *Kreiner, supra* at 518. The panel remanded for a jury trial because Fischer disputed Kreiner's claims regarding his limitations on working and hunting. The Court stated, however, that if Kreiner's claims were not in dispute, it would hold that Kreiner satisfied the serious impairment of body function threshold and that he would be entitled to summary disposition on that issue. The Court of Appeals directed the trial court to grant summary disposition to Kreiner if the trial court determined that there are no material factual disputes with respect to Kreiner's claims regarding the effect of his injury on his ability to work.

On appeal, this Court peremptorily vacated the Court of Appeals decision and remanded for consideration regarding "whether plaintiff's impairment affects his

20

general ability to lead his normal life." 468 Mich 885 (2003). This Court's order stated:

> The issue here is whether plaintiff satisfies the "serious impairment of body function" threshold set by the no-fault insurance act in order to be able to maintain an action for noneconomic tort damages. See MCL 500.3135(1). The no-fault act, MCL 500.3135(7), defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." The circuit court granted defendant's motion for summary disposition, concluding that plaintiff's impairment is not "serious enough" to meet the tort threshold. The Court of Appeals reversed, concluding that plaintiff is not required to show that his impairment "seriously" affects his ability to lead his normal life in order to meet the tort threshold. The Court of Appeals then concluded that, if the facts as alleged by plaintiff are true, his impairment has affected his general ability to lead his normal life. In our judgment, both the circuit court and the Court of Appeals erred. Although a *serious* effect is not required, *any* effect does not suffice either. Instead, the effect must be on one's *general* ability to lead his normal life. Because the Supreme Court believes that neither of the lower courts accurately addressed this issue, the case is remanded to the Court of Appeals for it to consider whether plaintiff's impairment affects his general ability to lead his normal life. [468 Mich 885 (2003)(emphasis in original).]

On remand, the same panel of the Court of Appeals again reversed the trial court's decision. *Kreiner v Fischer (On Remand)*, 256 Mich App 680; 671 NW2d 95 (2003). The Court of Appeals stated that this Court's order did not change in any significant manner the panel's analysis in

21

its previous opinion.  The panel reiterated a large portion of its previous analysis because this Court had vacated the prior opinion.  The Court of Appeals then agreed with this Court's order that, under MCL 500.3135(7), just *any* effect on a person's general ability to lead a normal life will not satisfy the statutory threshold.  Rather, the injury must affect one's *general* ability to lead his normal life. Although the panel stated that its previous opinion had addressed this issue, it further opined that "one's general ability to lead his or her normal life can be affected by an injury that impacts the person's ability to work at a job, where the job plays a significant role in that individual's normal life, such as in the case at bar." *Id*. at 688.  The Court further opined that Kreiner's limitations "if true, indicate that plaintiff suffered a serious impairment of body function under § 3135." *Id*. at 689.  We subsequently granted leave to appeal. 469 Mich 948 (2003).

### III. Standard of Review

This Court reviews de novo the grant or denial of summary disposition.  *American Federation of State, Co & Muni Employees v Detroit*, 468 Mich 388, 398; 662 NW2d 695 (2003). Similarly, questions of statutory interpretation

are reviewed de novo.  *In re MCI*, 460 Mich 396, 413; 596 NW2d 164 (1999).

## IV. Analysis

In construing statutes we examine the language the Legislature has used.  That language is the best indicator of the Legislature's intent.  *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001).

MCL 500.3135(1) provides:

> A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigure-ment.

The issue in these consolidated cases is whether plaintiffs have suffered a "serious impairment of body function."  MCL 500.3135(7) defines "serious impairment of body function" as

> an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.

The specific issue in these consolidated cases is whether plaintiffs' impairments affect their general ability to lead their normal lives.

In order to be able to maintain an action for noneconomic tort damages under the no-fault act, the "objectively manifested impairment of an important body function" that the plaintiff has suffered must affect his

23

"general ability" to lead his normal life. Determining whether the impairment affects a plaintiff's "general ability" to lead his normal life requires considering whether the plaintiff is "generally able" to lead his normal life. If he is generally able to do so, then his general ability to lead his normal life has not been affected by the impairment.

*Random House Webster's College Dictionary* (1991) defines "general" as "considering or dealing with broad, universal, or important aspects." "In general" is defined as "with respect to the entirety; as a whole." *Id*. "Generally" is defined as "with respect to the larger part; for the most part." *Id. Webster's New International Dictionary* defines "general" as "the whole; the total; that which comprehends or relates to all, or the chief part; a general proposition, fact, principle, etc.;—opposed to particular; that is, opposed to special." Accordingly, determining whether a plaintiff is "generally able" to lead his normal life requires considering whether the plaintiff is, "for the most part" able to lead his normal life.

In addition, to "lead" one's normal life contemplates more than a minor interruption in life. To "lead" means, among other things, "to conduct or bring in a particular

course."[13]  Given this meaning, the objectively manifested impairment of an important body function must affect the *course* of a person's life.  Accordingly, the effect of the impairment on the course of a plaintiff's entire normal life must be considered.  Although some aspects of a plaintiff's entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's "general ability" to lead his normal life has not been affected and he does not meet the "serious impairment of body function" threshold.[14]

The starting point in analyzing whether an impairment affects a person's "general" i.e., overall, ability to lead his normal life should be identifying how his life has been affected, by how much, and for how long.  Specific activities should be examined with an understanding that not all activities have the same significance in a person's overall life.  Also, minor changes in how a person performs

---

[13] *Random House Webster's Unabridged Dictionary* (2001).

[14] As we stated in *Kreiner,* 468 Mich at 885:

Although a *serious* effect is not required, *any* effect does not suffice either.  Instead, the effect must be on one's *general* ability to lead his normal life. (Emphasis in original).

a specific activity may not change the fact that the person may still "generally" be able to perform that activity.

From all the above we deduce several principles that a court must consider in determining whether a plaintiff who alleges a "serious impairment of body function" as a result of a motor vehicle accident meets the statutory threshold for third-party tort recovery. The following multi-step process is meant to provide the lower courts with a basic framework for separating out those plaintiffs who meet the statutory threshold from those who do not.

First, a court must determine that there is no factual dispute concerning the nature and extent of the person's injuries; or if there is a factual dispute, that it is not material to the determination whether the person has suffered a serious impairment of body function. If a court so concludes, it may continue to the next step. But, if a court determines there are factual disputes concerning the nature and extent of a plaintiff's injuries that are material to determining whether the plaintiff has suffered a serious impairment of body function, the court may not decide the issue as a matter of law. MCL 500.3135(2)(a)(i) and (ii).[15]

---

[15] MCL 500.3135(2)(a)(ii) creates a special rule for closed head injuries by providing that a question of fact for the jury is created if a licensed allopathic or

Second, if a court can decide the issue as a matter of law, it must next determine if an "important body function" of the plaintiff has been impaired.  It is insufficient if the impairment is of an unimportant body function.  Correspondingly, it is also insufficient if an important body function has been injured but not impaired.  If a court finds that an important body function has in fact been impaired, it must then determine if the impairment is objectively manifested.  Subjective complaints that are not medically documented are insufficient.

If a court finds that an important body function has been impaired, and that the impairment is objectively manifested, it then must determine if the impairment affects the plaintiff's general ability to lead his or her normal life.  In determining whether the course of plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of plaintiff's overall life.  Once this is identified, the court must engage in an objective analysis regarding whether any difference between plaintiff's pre- and post-

osteopathic physician who regularly diagnoses or treats closed head injuries testifies under oath that there may be a serious neurological injury.

27

accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "*any* effect" on the plaintiff's life is insufficient because a de minimus effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.[16]

The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment[17], and (e) the prognosis for eventual recovery.[18]    This list of factors is not meant to be

---

[16] Contrary to the dissent, we do not require that "every aspect of a person's life must be affected in order to satisfy the tort threshold." *Post* at 22.  Rather, in a quite distinct proposition, we merely require that the whole life be *considered* in determining what satisfies this threshold, i.e., whether an impairment "affects the person's general ability to lead his or her normal life."

[17] Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point.

[18] See *DiFranco, supra* at 67-70; *Hermann v Haney*, 98 Mich App 445; 296 NW2d 278 (1980).  The dissent argues that these factors have no bases in the statutory text. *Post* at 14-15.   The statutory text provides that "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life" is a "serious impairment of body function."

exclusive nor are any of the individual factors meant to be dispositive by themselves.  For example, that the duration of the impairment is short does not necessarily preclude a finding of a "serious impairment of body function."  On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function."  Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life."[19]

## V. Application to Straub

We are satisfied that there is no material factual dispute regarding the nature and extent of Straub's

---

MCL 500.3135(7).  Does the dissent really believe that an impairment lasting only a few moments has the same effect on a person's "general ability to lead his or her normal life" as an impairment lasting several years or that an impairment requiring annual treatment has the same effect on a person's "general ability to lead his or her normal life" as an impairment requiring daily treatment?

[19] We agree with the dissent that the "serious impairment of body function" inquiry must "proceed[] on a case-by-case basis because the statute requires inherently fact-specific and circumstantial determinations."  *Post* at 10.  Whether an impairment that precludes a person from throwing a ninety-five miles-an-hour fastball is a "serious impairment of body function" may depend on whether the person is a professional baseball player or an accountant who likes to play catch with his son every once in a while.

29

injuries.  Thus, it is proper to determine whether he sustained a serious impairment of body function as a matter of law.  MCL 500.3135(2)(a)(i).

First, we find that Straub's injuries to his nondominant hand (a closed fracture, open wounds, tendon injuries to two fingers, and a quarter-size wound on the palm) constituted an impairment of an important body function that was objectively manifested.

Thus, the issue is whether the impairment affected his general ability to live his life.  In determining whether Straub's general, overall ability to lead his preaccident life was affected, we consider his functional abilities and activities.  A necessary part of this analysis is determining how long and how pervasively his activities and abilities were affected.  While an injury need not be permanent, it must be of sufficient duration to affect the course of a plaintiff's life. The primary focus of the Court of Appeals was on the work Straub missed, even while initially acknowledging it was a "relatively limited time." 254 Mich App 459.  Straub did not work for eight weeks.[20] Over the next three weeks, Straub worked twenty to twenty-five hours a week at his primary job as a cable lineman. This time frame coincided with the deer hunting season.

---

[20] His doctor had authorized him to return to work two weeks earlier than he did.

Because Straub had been advised not to use his left hand, he did not operate his shop or process deer for that season.

The Court of Appeals considered an additional month of work "disability" because Straub did not return to his weekend job as a bass guitar player until mid-January 2000. Straub estimated that over a four-month period he had to miss fifteen to twenty club dates.

Straub's treatment consisted of having his wounds sutured, wearing a cast, and taking antibiotics and pain medication. Four days after the accident, outpatient surgery was performed on the fingers and palm. The treatment was not significant or long-term. Within two months, the fracture and surgical wounds had healed. There were two sessions of physical therapy. At that point, Straub discontinued all medical treatment. Plaintiff estimated he was ninety-nine percent back to normal by mid-January 2000. Given that Straub's injury was not extensive, recuperation was short, unremarkable, and virtually complete, and the effect of the injury on body function was not pervasive, we conclude that Straub's general ability to live his normal life was not affected. There is no medical evidence that Straub has any residual impairment or that the course of Straub's life has been

31

affected. The temporary limitations Straub experienced do not satisfy the statutory prerequisites. Considered against the backdrop of his preimpairment life and the limited nature and extent of his injuries, we conclude that Straub's postimpairment life is not so different that his "general ability" to lead his normal life has been affected. Because the course of Straub's normal life has not been affected, he failed to satisfy the "serious impairment of body function" threshold for recovery of noneconomic damages. Accordingly, the trial court properly granted summary disposition for defendants in Straub's lawsuit.

## VI. Application to Kreiner

We are satisfied that there is no factual dispute that is material to the determination whether Kreiner suffered a serious impairment of body function.[21] Thus, it is appropriate to determine as a matter of law whether he experienced a serious impairment of body function. MCL 500.3135(2)(a)(ii).

---

[21] Although there is a factual dispute concerning the nature and extent of plaintiff's injuries, this dispute is not material to the determination whether plaintiff has suffered a "serious impairment of body function" because even assuming that all plaintiff's allegations concerning the nature and extent of his injuries are true, we conclude that plaintiff has still not suffered a "serious impairment of body function."

First, we find that Kreiner's medically documented injuries to his lower back, right hip, and right leg constitute an impairment of an important body function that was objectively manifested.

Thus, the issue is whether the impairment affected his general ability to lead his life. We find that Kreiner's impairment did not affect his overall or broad ability to conduct the course of his normal life. In fact, his life after the accident was not significantly different than it was before the accident. He continued working as a self-employed carpenter and construction worker and was still able to perform all the work that he did before, with the possible exception of roofing work. His injuries did not cause him to miss one day of work.

Kreiner states that he can no longer stand on a ladder for longer than twenty minutes, can no longer lift anything over eighty pounds, and was forced to limit his workday to six hours because he can no longer work eight-hour days. Kreiner does not contend, however, that these limitations prevent him from performing his job. He also has difficulty walking more than a half mile without resting and can no longer hunt rabbits, although he continues to hunt deer.

33

Looking at Kreiner's life as a whole, before and after the accident, and the nature and extent of his injuries, we conclude that his impairment did not affect his overall ability to conduct the course of his normal life.[22] While he cannot work to full capacity, he is generally able to lead his normal life. A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life. Considered against the backdrop of his preimpairment life, Kreiner's postimpairment life is not so different that his "general ability" to conduct the course of his normal life has been affected.[23]

Because Kreiner failed to establish that his impairment affected his general ability to conduct the

---

[22] As the trial court noted, plaintiff, while somewhat restricted, is able to engage in lifting, bending, twisting, and standing as required by his job.

[23] Contrary to the dissent's contention, we are not concluding that Kreiner would have to show that he is unable to work at all in order to show that he has suffered a "serious impairment of body function." *Post* at 20. Instead, we are simply concluding that, although plaintiff has suffered an impairment that does have an effect on his ability to work, it is not a "serious impairment of body function," as defined by the Legislature, because plaintiff is "generally able" to work and the course of his normal life is otherwise unaffected. We disagree with the dissent's suggestion that *any* effect on one's ability to work is sufficient to establish a "serious impairment of body function."

course of his normal life, he did not satisfy the "serious impairment of body function" threshold for recovery of noneconomic damages. Accordingly, the trial court properly granted summary disposition of Kreiner's lawsuit.

## VII. Response to the dissent

It must be pointed out that the dissent's approach leads to the rather dismaying conclusion that the intent of the Legislature in 1995 was, in effect, to pull down the no-fault temple and produce an auto insurance catastrophe for the state's drivers. That is, the dissent concludes that the 1995 amendment, despite no words to this effect, was designed, as the thrust of his argument makes clear, to undermine the great compromise (no-fault benefits in return for limited tort remedies) that all previous Supreme Court decisions have recognized as existing in the no-fault legislation and that is an indispensable requirement to make no-fault viable. We decline to join him in this calculated exercise predicated on what we believe is a studied ignorance of what the Legislature intended.

## VIII. Conclusion

In both of the cases before us the trial courts granted summary disposition for defendants because the courts determined that plaintiffs had not established a serious impairment of a body function. The respective

35

panels of the Court of Appeals, however, reversed.  We reverse the judgments of the Court of Appeals because we conclude that the trial courts properly determined that plaintiffs did not establish a serious impairment of body function.

The decision of the Court of Appeals is reversed in *Straub.*

The decision of the Court of Appeals is reversed in *Kreiner.*

> Clifford W. Taylor
> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman

# STATE OF MICHIGAN

## SUPREME COURT

RICHARD ADAM KREINER,

      Plaintiff-Appellee,

v                                   No. 124120

ROBERT OAKLAND FISCHER,

      Defendant-Appellant.

_____

DANIEL LEE STRAUB,

      Plaintiff-Appellee,

v                                   No. 124757

PHILLIP MICHAEL COLLETTE and
TERESA M. HEIL-WYLIE,

      Defendants-Appellants.

_____

CAVANAGH, J. (*dissenting*).

    In these cases, this Court is called upon to interpret MCL 500.3135. Because I disagree with the majority's construction of MCL 500.3135(7) and the result reached in these cases, I must respectfully dissent. Accordingly, I would affirm the decisions of the Court of Appeals.

## I. Rules of Statutory Interpretation

Questions of statutory interpretation are questions of law, which this Court reviews de novo. *In re MCI Telecom Complaint*, 460 Mich 396, 413; 596 NW2d 164 (1999). "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Id.* at 411. To this end, this Court abides by the governing principle that the first step in determining the Legislature's intent is to examine the language of the statute itself. *Id.* "If the statute is unambiguous on its face, the Legislature will be presumed to have intended the meaning expressed, and judicial construction is neither required nor permissible." *Id.*

## II. MCL 500.3135

MCL 500.3135(1) unambiguously states that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(2) provides in pertinent part:

> For a cause of action for damages pursuant to subsection (1) filed on or after July 26, 1996, all of the following apply:
>
> (a) The issues of whether an injured person has suffered serious impairment of body function

2

or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

(i) There is no factual dispute concerning the nature and extent of the person's injuries.

(ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement.

Pursuant to the plain and unambiguous language of § 3135(2), the trial court determines, as a question of law, whether a particular plaintiff has satisfied the tort threshold under two enumerated circumstances. Namely, (1) where there is no factual dispute concerning the plaintiff's injuries, or (2) where there is a factual dispute concerning the plaintiff's injuries, but the dispute is not material or outcome determinative regarding whether the plaintiff suffered a serious impairment of body function or permanent serious disfigurement.

The question becomes, however, who decides whether a particular plaintiff has satisfied the tort threshold where there is a factual dispute concerning the nature and extent of the plaintiff's injuries *and* such a dispute is material or outcome determinative with respect to the serious impairment of body function or permanent serious disfigurement issue. The most natural reading of the statute suggests that in such a situation, a question of

3

fact is presented for the jury and the jury decides whether the plaintiff has suffered a serious impairment of body function or permanent serious disfigurement.

Important to the resolution of these cases is the statutory definition of "serious impairment of body function." MCL 500.3135(7) unambiguously states, "As used in this section, 'serious impairment of body function' means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." The Legislature's definition necessarily contains three elements. A serious impairment of body function is (1) an objectively manifested impairment, (2) of an important body function, (3) that affects the person's general ability to lead his normal life. All three requirements must be satisfied and, thus, a thorough review of each requirement is necessary.

A. Objectively Manifested

The clear import of the "objectively manifested" requirement is that the impairment must be observable or identifiable in order for the impairment to satisfy the first prong of the legislative definition. "Objective" means "1. Of or having to do with a material object as distinguished from a mental concept. 2. Having actual existence or reality. 3. a. Uninfluenced by emotion,

4

surmise, or personal prejudice.  b. Based on observable phenomena; presented factually . . . ." *The American Heritage Dictionary, Second College Edition* (1982). Further, "manifest" means "[c]learly apparent to the sight or understanding . . . . To show or demonstrate plainly; reveal . . . ." *Id*.  Thus, the first prong of the serious impairment of body function analysis is, effectively, an objective inquiry.

## B. Of an Important Body Function

Once it is determined that the impairment is objectively manifested, the trial court or jury must then decide whether an important body function is impaired. "Important" means "[m]arked by or having great value, significance, or consequence. . . ." *Id*.  Importance or value is necessarily a subjective inquiry—what may be important to one individual may not be as important or valuable to another.  As such, the Legislature plainly intended the second prong of the analysis to be subjective in nature, in contrast to the first prong.[1]  Thus, the "of an important body function" analysis does not lend itself

---

[1] Although it may be appropriate for a court to engage in a so-called objective analysis of the "important body function" prong, such an analysis is still undertaken with the goal of ascertaining the subjective importance that a particular plaintiff places on that body function.

5

to any judicial line drawing, and the utilization of nonexhaustive factors is unwarranted.

For example, suppose a person is injured in a motor vehicle accident and, as result, the person is unable to fully manipulate her pinky finger to some degree. To an "average" person, the ability to fully extend or bend her pinky finger may not be important. But suppose the person injured in the motor vehicle accident is Roger Clemens (and he loses the zip on his fastball), or B. B. King (and he can no longer play guitar in the same fashion), or Annika Sorenstam (and she loses the distance on her drives). For these individuals, the ability to manipulate their pinky finger is important. Therefore, the unambiguous language of MCL 500.3135(7) does not lend itself to any bright-line rule and the analysis of this prong must proceed on a case-by-case basis.

### C. That Affects the Person's General Ability to Lead His or Her Normal Life

Central to the resolution of these cases is the proper interpretation of the third prong of the Legislature's definition of "serious impairment of body function." "Affect" means "[t]o have an influence on; bring about a change in." *American Heritage Dictionary*, *supra*. "General" means:

1. Relating to, concerned with, or applicable to the whole or every member of a class or category. 2. Affecting or characteristic of the majority of those involved; prevalent: *a general discontent*. 3. Being usually the case; true or applicable in most instances but not all. 4. a. Not limited in scope, area, or application: *as a general rule*. b. Not limited to one class of things: *general studies*. [*Id*. (emphasis in original).]

"Able" means "having sufficient power, skill, or resources to accomplish an object [sic, objective]." *Merriam-Webster Online Dictionary*, <http://www.m-w.com> (accessed June 21, 2004). Thus, the Legislature requires that the impairment have an influence on most, but not all, of the person's capacity "to lead his or her normal life."

The last phrase in the statutory definition of "serious impairment of body function" inevitably contemplates a subjective inquiry. The phrase "his or her normal life" requires a court to compare a particular plaintiff's life before and after the impairment. Further, a person's "normal" life is unavoidably relative and, thus, inherently subjective. Because such an endeavor proceeds on a case-by-case basis and each particular plaintiff's ability to lead his own normal life is uniquely individualized, the third prong is not amenable to any bright-line rule or set of nonexhaustive factors.

In sum, the third prong of the serious impairment of body function analysis requires a reviewing court to

7

compare the plaintiff's pre- and post-accident life and determine whether the impairment has an influence on most, but not all, of the plaintiff's capacities to lead his preaccident lifestyle.[2]

### III. The Legislature's Stated Test

On the basis of the foregoing, the unambiguous statute sets forth the following test. The first step in the serious impairment of body function analysis is to determine whether there is a factual dispute concerning the nature and extent of the person's injuries and, if there is a factual dispute, whether the dispute is material to the serious impairment of body function issue.

If there is no factual dispute concerning the nature and extent of the person's injuries, a question of law is presented for the trial court. MCL 500.3135(2)(a)(i).

If there is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to adjudging whether the person has suffered a

---

[2] Similar to the second prong, the third prong of the analysis is inherently subjective in nature. While a court may engage in a so-called objective analysis to determine whether the impairment affects the person's general ability to lead his normal life, this endeavor is made with the understanding that a person's subjective normal life is the relevant frame of reference.

serious impairment of body function, a question of law is presented for the trial court.  MCL 500.3135(2)(a)(ii).

If there is a factual dispute concerning the nature and extent of the person's injuries and the dispute is material to adjudging whether the person has suffered a serious impairment of body function, a question of fact is presented for the jury.

Once this initial determination is made, the second step is to decide whether the Legislature's statutory definition has been fulfilled.  Under the plain and unambiguous language of MCL 500.3135(7), the serious impairment of body function threshold is satisfied where the impairment is (1) an objectively manifested impairment (observable and indentifable), (2) of an important body function (a body function that the particular plaintiff deems valuable), (3) that affects the person's general ability to lead his normal life (influences most, but not necessarily all, of the particular plaintiff's capacity to lead his own unique preaccident lifestyle).

The Legislature's statutory definition does not lend itself to any bright-line rule or imposition of nonexhaustive list of factors.  Instead, the "serious impairment of body function" inquiry proceeds on a case-by-case basis because the statute requires inherently fact-

9

specific and circumstantial determinations. The Legislature recognized that what is important to one is not important to all, a brief impairment may be devastating whereas a near permanent impairment may have little effect. The Legislature avoided drawing lines in the sand and so must we.

### IV. Application of the Legislature's Stated Test

#### A. *Straub v Collette*

Because there is no factual dispute regarding the nature and extent of plaintiff Straub's injuries, the existence of a serious impairment of body function is determined as a matter of law. MCL 500.3135(2)(a)(i). There is little debate that Straub's injuries to his hand were observable and identifiable. Straub sustained a closed left fifth metacarpal fracture, as well as open wounds and tendon injuries to his middle and ring fingers. Thus, Straub's impairment was objectively manifested and, therefore, the first prong of the statutory definition is satisfied.

The second prong of the serious impairment of body function analysis is satisfied where the impairment is to a body function that Straub considers valuable. According to Straub's testimony, the injury to his hand was to an important body function. Straub relied on the use of his

10

hand to work as a cable lineman, play guitar in his band, operate his bow shop during deer season, and perform household and personal tasks.  Thus, because Straub's use of his hand was related to important body functions, the second prong of MCL 500.3135(7) is satisfied.

Central to the resolution of this case is whether the third prong of the serious impairment analysis has been met; namely, whether the injury to his hand affected Straub's general ability to lead his normal life.  Under the undisputed facts in this case, I believe that Straub's injury had an influence on most, but not all, of Straub's capacity to lead his unique preaccident lifestyle.

Straub was able to work as a cable lineman before the motor vehicle accident, but could not perform that work following the accident.  Further, before the injury, Straub played in a band that practiced three or four times a week and played at clubs almost every weekend.  After the accident, Straub could not play his guitar.  Before the accident, Straub would operate his bow shop during deer season, but, as a result of the motor vehicle accident, he could not operate his shop during the 1999 season. Finally, Straub had difficulty performing household tasks in the same manner as he did before the accident.  As such, the impairment to Straub's hand had an influence on most,

11

but not all, of his capacity to lead his preaccident lifestyle. Therefore, under the plain and unambiguous language of MCL 500.3135(7), Straub has satisfied the tort threshold and I would affirm the decision of the Court of Appeals.

The majority reaches a contrary conclusion because it imposes additional requirements on Straub that the Legislature never envisioned. The majority places great weight on the fact that

> Straub's injury was not extensive, recuperation was short, unremarkable, and virtually complete, and the effect of the injury on body function was not pervasive . . . . There is no medical evidence that Straub has any *residual impairment or that the course of Straub's life has been affected*. The temporary limitations Straub experienced do not satisfy the statutory prerequisites. [*Ante* at 32 (emphasis added).]

However, the clear language of MCL 500.3135(7) does not make any express or implicit mention of time or temporal considerations. As noted above, under the no-fault act, a person may remain subject to tort liability if the injured person suffered death, permanent serious disfigurement, or serious impairment of body function. MCL 500.3135(1). Unlike death or permanent serious disfigurement, the serious impairment of body function threshold does not suggest any sort of temporal limitation. Further, the plain and unambiguous language of the

12

statutory definition of "serious impairment of body function" does not set forth any quantum of time the judge or jury must find dispositive when determining whether a serious impairment of body function has occurred. Therefore, the duration of the impairment is not an appropriate inquiry.

The majority noticeably departs from accepted principles of statutory interpretation when it concludes that certain temporal factors should be considered when evaluating whether the serious impairment of body function threshold has been met. For example, the majority reasons that "the type and length of treatment required," "the duration of the impairment," "the extent of any residual impairment," and "the prognosis for eventual recovery" are relevant factors to consider when making the threshold determination.[3] *Ante* at 28. Unlike the majority, however, I do not find any support for these considerations in the unambiguous language of MCL 500.3135(7).

Moreover, the majority disregards the principles of statutory interpretation that it claims to follow. For example, in construing the term "lead" in convenient

---

[3] Curiously, the majority finds support for these factors in *Hermann v Haney*, 98 Mich App 445; 296 NW2d 278 (1980), and *DiFranco v Pickard*, 427 Mich 32; 398 NW2d 896 (1986).

13

isolation, the majority states, "To 'lead' means, among other things, 'to conduct or bring in a particular course.'. . . Given this meaning, the objectively manifested impairment of an important body function must affect the *course* of a person's life. Accordingly, the affect of the impairment on the course of a plaintiff's *entire normal life* must be considered." *Ante* at 25 (citation omitted and emphasis added). Additionally, the majority further asserts that the impairment "must be of sufficient duration to affect the course of a plaintiff's life." *Id*. at 31. In what is best described as tortured logic, the majority has seen fit to impose a temporal requirement teetering on the brink of permanency into the unambiguous statute. Because the statute does not define "serious impairment of body function" with respect to permanency, or any temporal factor for that matter, the majority impermissibly adds additional requirements not found in the text of MCL 500.3135(7).[4]

---

[4] The majority poses the following question which I believe is indicative of the difference between the majority and the dissent in this case:

> Does the dissent really believe that an impairment lasting only a few moments has the same effect on a person's "general ability to lead his or her normal life" as an impairment

14

It is evident that the amount of time Straub was injured drives the majority's result. A fair reading of the majority opinion seems to indicate that if Straub's injuries were of a more permanent nature, the majority may be inclined to find that the requirements of MCL 500.3135(7) have been met. As mentioned above, however, unlike *death* or *permanent* serious disfigurement, nothing in the plain text of MCL 500.3135(7) suggests that the Legislature intended temporal limitations or permanency be considered when making the "serious impairment of body function" determination. Therefore, the majority errs when it reads additional language into the plain text of MCL 500.3135(7).

---

> lasting several years or that an impairment requiring annual treatment has the same effect on a person's "general ability to lead his or her normal life" as an impairment requiring daily treatment? [*Ante* at 29 n 18.]

In response, I must note that the statutory threshold is evaluated on a case-by-case basis and under the majority's rationale none of the majority's hypothetical plaintiffs is likely to meet the threshold. The majority would effortlessly conclude that interrupting several years out of, for example, forty is a minor interruption. This is precisely the reason why this Court should avoid reading additional temporal requirements into the unambiguous statute.

Moreover, my interpretation of MCL 500.3135(7) is not based on what I believe or hope. Rather, my interpretation is based on how the unambiguous statute is written and, unlike the majority, not how I personally believe the statute *should be* written.

15

While this roughly four-month serious impairment of body function may appear to be at odds with the stated purpose of the no-fault act, any trepidation over such a policy concern is best left to the Legislature. Because the statute does not speak in terms of "residual impairment," "recuperation," or "permanency," this Court should avoid reading those requirements into the plain and unambiguous text of the statute.

## B. *Kreiner v Fischer*

Because there is a factual dispute concerning the nature and extent of plaintiff Kreiner's injuries *and* such a dispute is material to the serious impairment of body function issue, a question of fact is presented. Kreiner is a self-employed construction worker and carpenter. Additionally, Kreiner engages in recreational hunting. After the motor vehicle accident, Kreiner claimed he could no longer work eight-hour days, was unable to stand on a ladder longer than twenty minutes, could no longer perform general roofing work, was unable to lift heavy items, could no longer walk more than one-half mile, and could no longer hunt rabbits.

Defendant attempted to submit videotapes to the trial court that allegedly demonstrate that Kreiner's injuries do not affect his life to the degree that Kreiner claims.

16

Additionally, in its brief to this Court, defendant argues that these videotapes show Kreiner climbing up and down extension ladders, driving nails, tearing off siding, reaching, lifting, and crawling on a roof. In initially remanding this case, the Court of Appeals directed the trial court to consider the admissibility of the videotape offered by defendant to determine whether there are material issues of fact regarding Kreiner's claims relative to the effects of his injuries. *Kreiner v Fischer*, 251 Mich App 513, 519; 651 NW2d 433 (2002), vacated and remanded 468 Mich 885 (2003). Thus, there is a factual dispute that is material to the serious impairment of body function issue because if the effects of Kreiner's injuries were undisputed, the requirements of MCL 500.3135(7) would be satisfied.

Kreiner's injuries were observable and identifiable. The injury to Kreiner's back was observable and verified by magnetic resonance imaging and electromyography examinations. Because the injury was objectively manifested, the first prong of MCL 500.3135(7) is satisfied. The second prong of the serious impairment of body function analysis is also satisfied because the impairment was to a body function that Kreiner deems valuable. According to Kreiner's testimony, the injury to

his back was to an important body function.  Kreiner relied on the use of his back to sustain his livelihood as a construction worker and carpenter.  Thus, the central issue for this Court to resolve is whether Kreiner's injury affected his general ability to lead his normal life.

The third prong of the statutory definition of "serious impairment of body function" is satisfied if the impairment has an influence on most, but not all, of Kreiner's capacity to lead his preaccident lifestyle.  In resolving this issue, I find the reasoning of the Court of Appeals on remand to be persuasive.

> We find that one's general ability to lead his or her normal life can be affected by an injury that impacts the person's ability to work at a job, where the job plays a significant role in that individual's normal life, such as in the case at bar.  Employment or one's livelihood, for a vast majority of people, constitutes an extremely important and major part of a person's life.  Whether it be wrong or right, our worth as individuals in society is often measured by our employment.  Losing the ability to work can be devastating; employment, regardless of income issues, is important to a sense of purpose and feeling of vitality.  For those working a standard forty-hour work week, a quarter of their lifetime before retirement is devoted to time spent on the job.  An injury affecting one's employment and ability to work, under the right factual circumstances, can be equated to affecting the person's *general* ability to lead his or her normal life.  For many, life in general revolves around a job and work.  It would be illogical to conclude that where a person loses the ability to work because of an injury resulting from a motor-vehicle collision, after

being gainfully employed, the person's life after the accident, in general, would be unaffected. [*Kreiner v Fischer (On Remand)*, 256 Mich App 680, 688-689; 671 NW2d 95 (2003).]

Moreover, the panel noted, "Here, there was documentary evidence presented by plaintiff that his ability to walk, undertake certain physical movements, and engage in recreational hunting was limited by the injury. These limitations along with plaintiff's alleged employment limitations, if true, indicate that plaintiff suffered a serious impairment of body function under § 3135." *Id*. at 689. Under the circumstances presented in this case, I would affirm the decision of the Court of Appeals because if Kreiner's claims are true, his injuries had an influence on most, but not all, of his capacity to lead his preaccident lifestyle. Additionally, because there is a factual dispute concerning the nature and extent of Kreiner's injuries and such a dispute is material with respect to MCL 500.3135(7), I would likewise remand this case to the trial court.

In support of its conclusion that Kreiner did not satisfy MCL 500.3135(7), the majority places great weight on the notion that Kreiner's life was "not significantly different than it was before the accident." *Ante* at 33. Specifically, the majority posits Kreiner "was still able to perform all the work that he did before, with the

possible exception of roofing work.  His injuries did not cause him to miss one day of work."  *Id*.  However, the majority also acknowledges that Kreiner "cannot work to full capacity . . . ."   *Id*. at 34. In an effort to reconcile this doublespeak, the majority then concludes that Kreiner's work was simply a "particular aspect" of his life and that Kreiner's "postimpairment life [was] not so different . . . ." *Id*. at 35.

Implicit in the majority's rationale is the idea that a person has not suffered a serious impairment of body function unless that person is absolutely precluded from engaging in their particular preaccident lifestyle and the impairment lasts the length of the person's life.  Stated differently, it is not enough that Kreiner can only function at seventy-five percent of his preaccident work ability, because the majority would conclude that Kreiner must not be able to work at all.[5]  It is not enough that Kreiner is limited in his lifting, bending, twisting, and

---

[5] The majority notes that "[d]espite his limitations, Kreiner's tax returns revealed that 1998 was his highest income-earning year, including several years before the injuries occurred."  *Id*. at 19 n 12.  However, such an assertion ignores the idea that Kreiner claims to have been working at seventy-five percent of his preaccident ability. If Kreiner's claims are true, Kreiner may have earned twenty-five percent more that year.  Thus, I do not find Kreiner's 1998 tax returns dispositive.

standing, because the majority would conclude that Kreiner must not be able to lift, bend, twist, and stand at all.[6] The majority would conclude that it is not enough that Kreiner cannot hunt rabbits, because Kreiner can hunt deer. The majority would conclude that it is not enough that Kreiner can no longer walk one-half mile, because Kreiner can still walk.

Such an all-or-nothing approach is not supported by the unambiguous text of the statute. Moreover, it is evident that the indivisible sum of the affected lifestyle activities mentioned above leads to the logical conclusion that Kreiner's injuries had an influence on most, but not all, of his capacity to lead his preaccident life. It is equally evident that the majority uses the facts of the *Kreiner* case to effectively create a more rigorous threshold requirement than that mandated by the Legislature.

Despite the majority's assertions to the contrary, its application of its stated test in *Kreiner* demonstrates that it believes that every aspect of a person's life must be affected in order to satisfy the tort threshold, and the

---

[6] As noted by the Court of Appeals, "injuries affecting the ability to work, by their very nature, often place physical limitations on numerous aspects of a person's life." *Kreiner (On Remand), supra* at 689.

effects must last the course of the plaintiff's entire normal life.  For example, the majority concludes that the term "general" in MCL 500.3135(7) means "entire," "whole," and "for the most part."  See *Ante* at 24.  Remarkably, the majority then determines that

> whether a plaintiff is "generally able" to lead his normal life requires considering whether the plaintiff is, "for the most part" able to lead his normal life.
>
> * * *
>
> [T]he effect of the impairment on the course of a *plaintiff's entire normal life* must be considered.  Although some aspects of a *plaintiff's entire normal life* may be interrupted by the impairment, if, despite those inpingements, the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's "general ability" to lead his normal life has not been affected and he does not meet the "serious impairment of body function" threshold.  [*Id*. at 25 (emphasis added).]

The majority further states, "*we* merely require that the *whole life* be *considered* in determining what satisfies [the] threshold . . . ."  *Id*. at 28 n 16 (emphasis added).

The term "general" as used in MCL 500.3135(7) does not, as the majority asserts, modify the phrase "to lead his or her normal life."  Rather, "general" modifies the term "ability."[7]  In a disingenuous sleight of hand, the

_____

[7] Again, MCL 500.3135(7) defines "serious impairment of body function" as "an objectively manifested impairment of

22

majority attempts to create a more difficult test than that required by the Legislature. MCL 500.3135(7) does not require that the impairment affect every aspect of the course of a person's "entire" or normal life.

Similarly, in its attempt to effectively raise the statutory threshold, the majority's actual application of its test seeks to revive *Cassidy v McGovern*, 415 Mich 483; 330 NW2d 22 (1982), in full. In *Cassidy*, this Court previously held that the "serious impairment of body function" threshold was satisfied where the injury affects "the person's general ability to live *a* normal life." *Id*. at 505 (emphasis added). Later, in *DiFranco v Pickard*, 427 Mich 32, 66; 398 NW2d 896 (1986), this Court found that standard flawed because "there is no such thing as 'a normal life.'" (Emphasis added.) In 1995, the Legislature amended the no-fault act and set forth its own definition of "serious impairment of body function."

The majority claims that in 1995 the Legislature was "[a]pparently cognizant" of the *DiFranco* Court's repudiation of *Cassidy*'s "a normal life" standard. *Ante* at 12 n 7. The majority further states:

> [T]he Legislature, in the 1995 act, requires that the impairment affect "the person's general

---

an important body function that affects the person's general ability to lead his or her normal life."

23

> ability to lead *his or her* normal life." (Emphasis added). It is then clear that, harkening to the *DiFranco* Court's guidance that there is no objectively "normal life," the Legislature modified the entirely objective *Cassidy* standard to a partially objective and partially subjective inquiry. [*Id.*]

In construing MCL 500.3135(7), the majority then concludes that the statute requires a comparison of the person's pre- and post-accident lifestyle.

However, the majority merely pays lip service to its own construction and fails to actually compare Kreiner's pre- and post-accident life. Kreiner framed the effects of his impairment in terms of the limitations he experienced at work, hunting rabbits, lifting and twisting, and walking more than one-half mile. Kreiner convincingly argued that these particular aspects were the indivisible sum of his normal life. The majority, however, simply concludes that these particular aspects of Kreiner's "life as a whole" are insufficient to meet the threshold. Implicit in the majority's actual application of its test is the conclusion that "a normal life" cannot consist solely of work, hunting rabbits, lifting and twisting, and walking more than one-half mile. Yet, MCL 500.3135(7) requires the impairment affect the *plaintiff's* normal life, not what the majority infers to be "*a* normal life." Kreiner's normal life apparently consisted of working, hunting rabbits, lifting

**24**

and twisting, and walking one-half mile and, thus, he satisfied the statutory threshold. In my opinion, the majority's actual application of its test is merely a subtle method of returning to the now refuted *Cassidy* "a normal life" standard in order to fashion what it believes to be a more difficult legislative definition.

The plain and unambiguous language set forth by the Legislature simply requires that the impairment affect a person's general ability to lead his normal life. Unlike the majority, I prefer to simply apply MCL 500.3135(7) as written and leave any unresolved policy concerns in the hands of the Legislature.

V. Response to the Response to the Dissent

I am cognizant of the overall purpose of the no-fault scheme. Further, I am aware that my view may be perceived as an invitation to increased litigation; but this is the logical byproduct of the unambiguous words chosen by the Legislature. Any apparent tension between the act's overall purpose and the Legislature's unambiguous statutory definition is best addressed by the Legislature itself.

The majority suggests that my approach is sacrilegious to the "no-fault temple" and is an exercise predicated on "studied ignorance." *Ante* at 35. While admittedly unaware that I was required to worship the no-fault insurance gods,

25

I believe that my "studied ignorance" is more properly labeled as "judicial restraint." If ignorance comes from applying this unambiguous statute as written and not substituting my own view for that of the Legislature, I must say that ignorance is bliss. If so-called wisdom comes from rewriting this unambiguous statute to comport with my own preference on how the statute *should be* written and applied, in this instance I must choose "ignorance."

Today's decision serves as a chilling reminder that activism comes in all guises, including so-called textualism.

## VI. Conclusion

Under accepted principles of statutory interpretation, a plain and unambiguous statute should speak for itself. We should not casually read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute. Because the majority departs from this premise, I must respectfully dissent. Rather, I would apply MCL 500.3135 as unambiguously written and, thus, affirm the decisions of the Court of Appeals.

> Michael F. Cavanagh
> Elizabeth A. Weaver
> Marilyn Kelly