# Order

**Michigan Supreme Court**
**Lansing, Michigan**

April 25, 2008

132385

DOUGLAS D. JONES,
      Plaintiff-Appellee,

v

KATHLEEN P. OLSON and TODD R. OLSON,
      Defendants-Appellants.

SC: 132385
COA: 268929
Wexford CC: 05-018785-NI

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

_____/

On December 5, 2007, the Court heard oral argument on the application for leave to appeal the September 21, 2006 judgment of the Court of Appeals. On order of the Court, the application is again considered. MCR 7.302(G)(1). In lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals and REINSTATE the judgment of the Wexford Circuit Court granting the defendants' motion for summary disposition. The circuit court properly found that the plaintiff was generally able to lead his normal life in spite of his injuries. *Kreiner v Fischer*, 471 Mich 109 (2004). The plaintiff's injuries were substantially similar to those considered in *Kreiner*'s companion case, *Straub v Collette*. *Id.*

CAVANAGH, J., dissents and states as follows:

Because I continue to believe that *Kreiner v Fischer*, 471 Mich 109 (2004), was wrongly decided, I join Justice Weaver's dissenting statement attached to the majority's order. I concur with her opinion that *Kreiner* is a prime example of the judiciary's gavel being used as the legislative pen. Therefore, I would also grant leave in this case, so as to overrule *Kreiner*.

However, recognizing that my objections to the legal analysis in *Kreiner* are yet to be shared by a majority of this Court, I write additionally because, even under that opinion's flawed logic, the plaintiff in this case, Jones, presents a valid claim. I must also note my disagreement with this Court's recently evidenced proclivity for reaching out to overturn this state's lower courts, especially when they diligently and faithfully apply this

Court's binding precedent—as the Court of Appeals did in this case.[1]

## APPLICATION OF *KREINER*

The majority opinion in *Kreiner* expressed several platitudes that seem to have been ignored in the majority's application of *Kreiner* to this case. The majority order in this case reinstates the grant of defendant's motion for summary disposition by the circuit court, which held that Jones's injury does not meet the statutory threshold of a "serious impairment of [a] body function," MCL 500.3135 (1), (7). The majority order simplistically states the basis for its holding: Jones's "injuries were substantially similar to those considered in *Kreiner*'s companion case, *Straub v Collette*." *Ante* at 1. The order contains no further discussion or analysis supporting or explaining its conclusion. Under a fair reading of *Kreiner*, the legal and factual assertions of this short analysis are unsupportable.

First, the order's legal proposition seems to contradict *Kreiner*'s own language. Simply comparing a previous plaintiff's injuries to a subsequent plaintiff's injuries is not consistent with *Kreiner*'s requirement of a case-by-case analysis, *Kreiner, supra* at 134:

> [I]n order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life."[19]

---

[19] We agree with the dissent that the "serious impairment of body function" inquiry must "proceed[] on a case-by-case basis because the statute requires inherently fact-specific and circumstantial determinations." . . . Whether an impairment that precludes a person from throwing a ninety-five miles-an-hour fastball is a "serious impairment of body function" may depend on whether the person is a professional baseball player or an accountant who likes to play catch with his son every once in a while.

---

The majority order here seems to ignore the above footnote by holding that because Jones's injuries are substantially similar to the plaintiff's in *Straub*, Jones's injuries are insufficient. Essentially, the order holds that if the injury suffered by the "accountant

---

[1] Indeed, the Court of Appeals in this case expressly applied *Kreiner*. I do not accept that the Court of Appeals is so inept as to misconstrue *Kreiner*'s thorough, 26-page opinion such that peremptory reversal by a one-paragraph order suffices. In short, if *Kreiner* is so easily misunderstood, its precepts must deserve revision or clearer articulation. Yet, the majority order offers no further guidance on how to apply it.

who likes to play catch with his son every once in a while" is insufficient, then "the professional baseball player" who suffers the same injury is likewise precluded from recovering noneconomic damages. *Id*. This is incorrect because, even assuming that Jones's injuries were identical to Straub's, Jones is entitled to an individual case-by-case evaluation of his injuries as they relate to his normal life, assuming Jones and Straub have different normal lives. Any other holding makes the above passage from *Kreiner* meaningless. Accordingly, despite my continued objection to *Kreiner*, if that opinion must be applied by the lower courts, I would not change its holding through peremptory order by presupposing that Jones's and Straub's normal lives were identically affected by their injuries.

Second, the order's one-sentence analysis erroneously contends that Jones's injuries "were substantially similar to" Straub's. *Ante* at 1. This is patently incorrect.

As described in *Kreiner*, Straub

injured three fingers on his nondominant hand when his motorcycle collided with an automobile on September 19, 1999. He suffered a broken bone in his little finger and injured tendons in his ring and middle fingers. Straub underwent outpatient surgery on September 23, 1999, to repair the tendons. No medical treatment was required for the broken bone. He wore a cast for about one month following surgery to assist the healing of the tendons. He also took prescription pain medication for about two weeks following the surgery and completed a physical therapy program.

About two months following the surgery, Straub's doctor noted that Straub's injuries were healing nicely. Around the same time, Straub returned to work . . . , initially working [part time], but returning to full-time work about three weeks later, on December 14, 1999. . . . [H]e testified that until late December 1999, he had difficulty doing household chores, such as washing dishes, doing yard work, and making property repairs. He was also unable to operate his archery shop during the hunting season in the fall of 1999. Operating his shop required him to repair bows, make arrows, and process deer meat. In mid-January 2000, however, he was able to resume playing bass guitar in a band that performed on weekends. By the time of Straub's deposition, he could perform all the activities in which he had engaged before the accident, although he was still unable to completely straighten his middle finger. He was also still unable to completely close his left hand, which decreased his grip strength. [*Kreiner*, *supra* at 122-123.]

Jones's injuries are demonstrably different from Straub's. They lasted longer,

were qualitatively different, and were physically different.[2]

In August 2003, Jones was injured in a car accident that was caused by defendant, Olson. After the accident, Jones was taken to a hospital when he complained of neck and back pain, among several other less-severe injuries. He was released from the hospital after 9 to 10 hours. Eventually, Jones was diagnosed with having fractured vertebra in his neck (at C-7), for which he was fitted with a "C-collar" for two months. Also, MRI scans revealed disc bulges in his neck at C6-7 and C5-6 levels. The neck and back injuries were caused by him hitting his head on the window pylon in his car.

Jones continued seeing a neurologist through January 2004 for treatment of his neck and back injuries. As of November 2003, he was complaining of persistent pain in his neck with radiating numbness into his shoulders and arms. By January 2004, he reported continued neck and back pain with decreased rotation and movement of both, but denied radiating numbness. From January 2004 to February 2004, he underwent physical therapy, with good results. From the accident until February 12, 2004, he had not been medically released to return to work, which entailed pouring and setting up cement walls. On February 12, he was released to restart work for only three hours a day for two days a week. This limited schedule was increased to full time within two to four weeks after the initial work restart date (approximately early April 2004).

During the entire six months Jones was off work, he was unable to do several activities that he normally did in his pre-accident life.[3] Those activities included hunting, snowmobiling, playing softball, doing yard work, and taking long walks with his girlfriend (which he commonly did four or five nights a week). Also, during the first two months after the accident, Jones was unable to be intimate with his girlfriend, dress himself, feed himself, drive a car, or take his son to school. Since early or mid-March 2004, when he regained full-time work status, Jones has resumed all pre-accident work activities and pre-accident normal life activities.

A review of these facts demonstrates that Jones's injury is different from Straub's. In sum, Straub broke his little finger and injured two others, which caused him to be unable to work and do home maintenance for slightly over two months. Whereas, Jones broke his neck and strained his back, which rendered him almost completely dependent on his family for two months and unable to work or enjoy recreational activities for a total of six months. The only thing remotely similar, much less "substantially similar,"

---

[2] While I agree with Justice Weaver's recitation of the facts regarding Jones's injuries, they bear reiterating to note their differences from Straub's injuries.

[3] Despite discussions of whether Jones's *current* employer had work for him during this entire 6-month period, the fact remains that Jones was indisputably, medically unable to perform his profession for *any* employer during the entire period.

regarding Straub's and Jones's injuries is that they were both caused by a car accident. Other than that, they are factually distinguishable, which is of great legal import in *Kreiner*'s case-by-case analysis.

Finally, if the two cases encompassed in *Kreiner* are usable by way of comparison, it is unclear why Straub's injuries are applicable here, while Kreiner's are not. Moreover, the order does not explain whether only Straub's injuries can be used in such a comparative analysis. I would not leave the lower courts with such little guidance. Nonetheless, assuming that there is some basis for only comparing Jones's injuries with Straub's, Jones's injury meets *Kreiner*'s threshold test.

Therefore, while retaining my continued disagreement with *Kreiner*, I would not disturb the Court of Appeals holding that Jones's claim meets the statutory threshold of a "serious impairment of [a] body function," as defined by the majority in *Kreiner* and the editors of Random House Webster's College Dictionary (1991). *Kreiner*, *supra* at 130.

I dissent.

WEAVER and KELLY, JJ., join the statement of CAVANAGH, J.

WEAVER, J., dissents and states as follows:

Every law-abiding car owner in Michigan who has obediently, as required by law, purchased no-fault automobile insurance with the expectation of being able to recover damages for serious impairment of bodily function in the unfortunate event of serious injury should know about this case.

By importing the concept of permanency of injury into MCL 500.3135—a concept that is nowhere referenced in the text of the statute—the majority of four (Chief Justice Taylor, and Justices Corrigan, Young, and Markman), in *Kreiner v Fischer*, 471 Mich 109 (2004), actively and judicially legislated a permanency and temporal requirement to recover noneconomic damages in automobile accident cases. The *Kreiner* interpretation of MCL 500.3135 is an unrestrained misuse and abuse of the power of interpretation masquerading as an exercise in following the Legislature's intent.

I dissent from the majority of four's reversal of the judgment of the Court of Appeals in this case because the majority's analysis and application of *Kreiner v Fischer* continues the misinterpretation of MCL 500.3135. Although the Court of Appeals reached the right result, I would grant leave to appeal to correct the majority's misinterpretation of MCL 500.3135 in *Kreiner*.

## I. Facts of *Jones v Olson*

On August 1, 2003, the plaintiff, Douglas Jones, was westbound on M-115 when the defendant, Kathleen Olson, pulled out directly in front of the plaintiff's vehicle. The defendant's car hit the front right side of the plaintiff's car. The plaintiff sustained injuries and complained of head and neck pain. The plaintiff was taken to Mercy Hospital after the accident. Doctors diagnosed the plaintiff with a fractured vertebrae in his neck and fitted him with a C-collar. The plaintiff was released after 9 to 10 hours and was advised to consult a neurologist.

The plaintiff continued to complain of persistent neck and shoulder pain and numbness in his shoulders and arms. A magnetic resonance imaging report of the plaintiff's spine showed disc bulges at the C6-7 and C5-6 levels. The plaintiff continued to see his neurologist and underwent physical therapy sessions through February 2004. In March 2004, the plaintiff returned to work full-time where he helped pour and set cement walls.

The plaintiff testified that during the months that he was unable to work, he was also unable to hunt, go snowmobiling, play softball, do yard work, or take long walks with his girlfriend—activities he enjoyed before the accident. Further, the plaintiff stated that for the first few months after the accident, he had difficulty dressing and feeding himself. He also required the help of his mother, grandmother, and girlfriend to prepare his son for school in the mornings. Plaintiff testified that he was able to return to work and resume all normal activities in March 2004.

The defendant refused to pay the plaintiff noneconomic damages. The plaintiff filed suit for damages with the Wexford Circuit Court. The defendant moved for summary disposition, asserting that the plaintiff had failed to establish a genuine issue of material fact regarding whether he suffered a serious impairment of bodily function. The circuit court granted the defendant's motion for summary disposition, and the plaintiff appealed. The Court of Appeals reversed the circuit court and remanded the case for trial. Unpublished opinion per curium, issued September 21, 2006 (Docket No. 268929).

The majority of four now reverses the Court of Appeals judgment by order, stating that the plaintiff's injuries in this case are substantially similar to the injuries considered in *Kreiner*'s companion case, *Straub v Collette.*

With all due respect, I disagree with the majority's interpretation and application of MCL 500.3135 in this case, just as I did in *Kreiner* when joining Justice Cavanagh's dissent. 471 Mich at 139.

## II.  MCL 500.3135 and *Kreiner v Fischer*

MCL 500.3135 states in pertinent part:

(1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

\* \* \*

(7) As used in this section, "serious impairment of body function" means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.

In *Kreiner v Fischer* the majority incorrectly interpreted MCL 500.3135 and created a test for determining when a person injured in an automobile accident can recover noneconomic damages. The majority outlined a seemingly reasonable three-part test:

1. Determine that there is no factual dispute concerning the nature and extent of the person's injuries; or, if there is a factual dispute, that it is not material to the determination whether the person has suffered a serious impairment of body function. See *Kreiner* at 131, 132.

2. If a court can decide the issue as a matter of law, the court must next determine if an important bodily function of the plaintiff has been impaired. See *Kreiner* at 132. The injury must be objectively manifested. *Id*.

3. If a court finds an objectively manifested impairment of an important bodily function, the court must then determine whether the impairment affects the plaintiff's general ability to lead his or her normal life. *Id.* A "multifaceted inquiry" into the plaintiff's lifestyle before and after the accident will determine whether the plaintiff's "general ability" to lead his or her life has been affected.

The majority's interpretation and application of MCL 500.3135 in *Kreiner* is flawed. The first two prongs in the majority's judicially created test are reasonable and derive from the language of MCL 500.3135. However, the third prong of the test, the determination of whether someone's "general ability" to lead his or her life has been affected, is flawed. The majority of four interpreted the phrase "general ability" in MCL 500.3135 to mean that a plaintiff cannot recover noneconomic damages for serious impairment of bodily function unless the impairment affects his or her life for an undefined and extended period of time—a requirement never mentioned in the text of MCL 500.3135.

The *Kreiner* majority invoked selective dictionary definitions to outline a test to determine when a person's "general ability" to lead his or her life is affected. The *Kreiner* majority stated:

*Random House Webster's College Dictionary* (1991) defines "general" as "considering or dealing with broad, universal, or important aspects." "In general" is defined as "with respect to the entirety; as a whole." *Id.* "Generally" is defined as "with respect to the larger part; for the most part." *Id.* *Webster's New International Dictionary* defines "general" as "the whole; the total; that which comprehends or relates to all, or the chief part; a general proposition, fact, principle, etc.;—opposed to particular; that is, opposed to special." Accordingly, determining whether a plaintiff is "generally able" to lead his normal life requires considering whether the plaintiff is, "for the most part" able to lead his normal life. [*Kreiner, supra*, 471 Mich at 130.]

In reaching the conclusion that a plaintiff's "general ability" to lead his or her life is affected only if he or she is unable to "for the most part" lead a normal life, the *Kreiner* majority selectively chose one definition of "general" among the many definitions available. More importantly, the *Kreiner* majority exalted the chosen definition as *the only* possible definition to determine what "general ability" under MCL 500.3135 means; according to the *Kreiner* analysis, the Legislature could not have meant "general ability" to mean anything other than "for the most part."

Such an interpretation is faulty and unreasonable. The *Kreiner* majority did not consider, nor did it discuss, other definitions of "general," and the consequences of applying those definitions in interpreting MCL 500.3135. For example, the *American Heritage Dictionary* (2004) defines "general," among other things, as "not limited in scope, area, or application; Not limited to or dealing with one class of things; diversified." Under this definition, MCL 500.3135 can be interpreted to mean that a person's "general ability" to lead his or her life is affected *if any part of the life is affected*, without limitations in scope, area, or application. This interpretation is diametrically opposed to the *Kreiner* majority's interpretation of "general ability," and yet it derives from the same source: a dictionary definition of the word "general."

The above example illustrates the *Kreiner* majority's error in using a selective dictionary definition as the be-all-and-end-all source for determining what a particular word means within a statute. A dictionary is defined, among other things, as "a reference book containing an alphabetical list of words, with information given for each word, usually including meanings, pronunciation, and etymology; a glossary." *American Heritage Dictionary* (2004). A dictionary is meant to be a *reference*, not an exhaustive source for all etymological information.

In the legal context, using a dictionary to unwaveringly determine the legislative intent behind a statute is nothing more than barely hidden judicial activism. Instead of determining the true intent behind a statute, a majority of the Court can now simply agree upon a single dictionary definition, taken from among many dictionary definitions, as the

controlling definition for the statute. Worse, given the expansive nature of dictionary definitions where all possible, sometimes contradictory, definitions are listed, a majority can pick and choose a definition that is most appealing to the majority's own point of view, even if a chosen definition defies common sense.

For all intents and purposes, the *Kreiner* majority held that unless a person "for the most part" can no longer live his or her life, he or she cannot recover noneconomic damages under MCL 500.3135. The only way a person can no longer "for the most part" live his or her life is if the "overall or broad ability" to "conduct the course of his life" is affected. While paying lip service to the contrary, the *Kreiner* majority faction in essence held that a plaintiff cannot recover noneconomic damages for serious impairment of bodily function unless the impairment affects his or her life ad infinitum.

As Justice Cavanagh correctly stated in his dissent in *Kreiner*, "nothing in the plain text of MCL 500.3135(7) suggests that the Legislature intended temporal limitations or permanency be considered when making the 'serious impairment of body function' determination." *Kreiner v Fischer*, *supra* at 149. By importing the concept of permanency of injury into MCL 500.3135—a concept that is nowhere referenced in the statute—the *Kreiner* majority actively and judicially legislated an additional requirement for obtaining noneconomic damages in automobile accident cases.

### III.

The majority's brief order relying on the faulty analysis in *Kreiner* in this case merely states that the plaintiff's injuries are "substantially similar to those considered in *Kreiner*'s companion case, *Straub v Collette*." *Ante* at 1. Regardless of whether the injuries are the same in kind or different, the plaintiff's general ability to lead his life after the accident was affected. As noted by the Court of Appeals:

> Plaintiff's general ability to lead his normal life was put entirely on hold for the first two months after the accident, and returned only gradually over the following four months. Plaintiff's lifestyle before the injury was dramatically different from his lifestyle for the six months after the accident. Following the *Kreiner* Court's dictate that an injury need not be permanent to constitute a serious impairment, we hold that where, as here, an injury entirely disrupts a person's ability to lead his normal life, the fact that the person eventually recovers does not preclude recovery for that injury. [*Jones v Olson*, *supra*, slip op at 2.]

Additionally, it is irrelevant whether the facts of the present case are similar to the facts in *Straub v Collette*, because the majority's analysis of MCL 500.3135 in *Kreiner* is flawed and should be revisited. The *Kreiner* majority judicially created a new

requirement for recovery of noneconomic damages that is not found in the text of the MCL 500.3135.

I dissent from the majority's reversal of the judgment of the Court of Appeals in this case because I disagree with the majority's analysis and application of *Kreiner v Fischer*. Although the Court of Appeals correctly determined that the plaintiff's general ability to conduct the course of his normal life has been affected as a result of his injuries, as required to recover noneconomic damages under MCL 500.3135, I would grant leave to appeal to reconsider the majority's interpretation of MCL 500.3135 in *Kreiner v Fischer*.

CAVANAGH and KELLY, JJ., join the statement of WEAVER, J.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

April 25, 2008

_____
Clerk

t0416