BERKEYPILE v WESTFIELD INSURANCE COMPANY

Docket No. 274177. Submitted January 9, 2008, at Grand Rapids. Decided August 12, 2008, at 9:05 a.m. Leave to appeal sought.

Mary I. Berkeypile was injured in an automobile accident and brought an action against three of the drivers involved. After those drivers settled with Berkeypile, she brought an action in the Jackson Circuit Court against Westfield Insurance Company and Allied Property and Casualty Insurance Company, seeking recovery of uninsured-motorist benefits in connection with two unidentified hit-and-run drivers. Westfield, which insured the company car that Berkeypile was driving, moved for summary disposition, arguing in part that Berkeypile was not entitled to those benefits because she had received settlement amounts that exceeded the policy limit for uninsured-motorist coverage. The court, Charles A. Nelson, J., granted Westfield summary disposition, and Berkeypile appealed.

The Court of Appeals *held*:

The trial court erred by granting summary disposition to Westfield. While the trial court ruled as a matter of law that the uninsured-motorist coverage limit must be reduced by the aggregate of the settlements, the policy contains no language supporting the court's ruling reducing benefits, which left Westfield with no obligation to pay uninsured-motorist benefits. The language in the uninsured-motorist endorsement, including the policy's anti-duplication clause, prohibits the insured from receiving duplicate payments for the same noneconomic and excess economic losses or damages, which prevents overcompensation for losses. Trial has not yet occurred in this case, but Westfield would be liable for uninsured-motorist benefits equal to the difference by which any overall damages award exceeds the sum of the settlement proceeds, subject to the policy limit and any allocation of fault by the trier of fact.

Reversed and remanded.

*Donald M. Fulkerson* for Mary I. Berkeypile.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Deborah A. Hebert*), for Westfield Insurance Company.

Before: DAVIS, P.J., and MURPHY and WHITE, JJ.

MURPHY, J. Plaintiff, Mary I. Berkeypile, appeals by leave granted the trial court's order granting summary disposition in favor of defendant, Westfield Insurance Company, pursuant to MCR 2.116(C)(10) in this action involving the interpretation of an insurance policy issued by Westfield. Plaintiff was injured in a multiple-vehicle accident. The chief question posed to us is whether, under the pertinent language of the policy, plaintiff still has the potential right to recover uninsured motorist (UM) benefits from Westfield even though plaintiff previously received, through separate litigation against three of the drivers involved in the accident, settlement proceeds exceeding the $300,000 policy limit set forth in the UM endorsement of the Westfield policy. Stated another way, the issue is whether the settlement proceeds should be offset against the total amount of damages, not yet determined, or offset against the UM policy limit of $300,000 without any consideration of possible damages, which, given the amounts of the policy limit and the settlement proceeds, would eliminate any liability on Westfield's part under the policy. The trial court ruled, as a matter of law, that the policy limit must be reduced by the aggregate of the settlements, leaving Westfield with no obligation to pay plaintiff UM benefits. We reverse and remand, holding that there is no language in the policy supporting the trial court's benefits-reduction ruling and that the language in the UM endorsement dictates that any offset pertains only to duplicate payments for the same noneconomic and excess economic losses. Westfield would be liable for UM benefits equal to the difference by which any overall damages award exceeds the sum of the settlement proceeds, subject to the policy limit and any allocation of fault made by the trier of

fact. Because plaintiff's entitlement to coverage and damages has not yet been decided, nor have damages been assessed, and because she could conceivably receive damages exceeding the amount of the settlement proceeds, the trial court erred in granting summary disposition. We additionally reject Westfield's arguments concerning notice of and consent to the settlements.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff sustained various injuries in a multiple-vehicle accident while riding in a company vehicle insured by Westfield under a commercial automobile policy that included an endorsement providing for UM coverage in the amount of $300,000 for each accident.[1] Plaintiff first filed a tort action against three of the drivers involved in the accident. As a result of facilitation, one of the drivers, who had $300,000 in liability coverage, settled with plaintiff for $290,000, another driver, who had $100,000 in liability coverage, settled with plaintiff for $37,500, and the third driver, who also had $100,000 in liability coverage, settled with plaintiff for $5,000. The sum of the three settlements is $332,500—$32,500 over the UM coverage limit. The UM endorsement defines an "uninsured motor vehicle" as including, in part, an *under*insured motor vehicle and a hit-and-run vehicle for which the driver and owner cannot be identified. With respect to the earlier litigation, it is undisputed that two of the three drivers sued by plaintiff, those with $100,000 in liability coverage on their vehicles, are considered to have been driving underinsured vehicles under the definition of "underinsured vehicle" in the UM endorsement. These

---

[1] The police report indicated that the accident involved six moving vehicles.

vehicles would therefore qualify as uninsured motor vehicles, falling under the umbrella of the UM endorsement. Two other vehicles involved in the accident that were not the subject of the prior lawsuit constituted, according to plaintiff, hit-and-run vehicles operated and owned by unknown persons, thereby also falling within the scope of the UM endorsement.[2]

Plaintiff thereafter filed this action against Westfield and Allied Property and Casualty Insurance Company to recover UM benefits.[3] We note, however, that the complaint made no claim of negligence or liability with respect to the two underinsured motorists. Therefore, the demand for UM benefits is not predicated on any alleged liability of the underinsured drivers. Rather, the complaint extensively outlined the alleged negligence and liability of the two unidentified hit-and-run drivers, which allegations form the basis of the claims for UM benefits against Westfield and Allied. Additionally, plaintiff's complaint alleged that the negligence of the two unidentified motorists caused her to suffer serious physical injuries, resulting in noneconomic and economic losses. Westfield filed a counterclaim, seeking a declaratory judgment that plaintiff is not entitled to any UM benefits.

Westfield moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff received well over $300,000 in settlement payments; therefore, because she had already recovered more than the policy limit for her injuries, she was no longer entitled to any

[2] Westfield states that these two vehicles may have been "uninsured" and does not concede the point, but it proceeds by assuming that they were uninsured for purposes of summary disposition, given that the evidence must be viewed in a light most favorable to plaintiff.

[3] Allied is plaintiff's own automobile insurance carrier, and the action against Allied remains pending. Plaintiff has received personal protection insurance benefits from Allied.

UM benefits. Westfield's position was that the UM coverage guaranteed an injured insured coverage for losses of up to $300,000 when injured by an uninsured motorist and that this included any payments received from legally responsible parties.[4] According to Westfield, the settlements reduced the $300,000 in available UM coverage, with the benefits acting as a gap filler, although there was no gap here, given that the settlements exceeded $300,000.[5] Westfield additionally contended that plaintiff had settled with the three drivers in the previous litigation without giving Westfield written notice and without obtaining its consent to settle, thereby violating the policy and depriving plaintiff of any coverage.

In response, plaintiff maintained that the policy language allows her to recover UM benefits from Westfield for the difference between the aggregate of the third-party settlements and the total amount of her damages as determined by the jury, should they exceed the settlement proceeds, up to the $300,000 policy limit. In this way, plaintiff could be made whole. Plaintiff contended that the policy merely precludes a double recovery for the same losses and that if a jury were to find damages in excess of the settlement amounts and Westfield were to pay that difference to plaintiff, there would be no duplicate recovery or payment. Plaintiff further argued that the notice and consent provisions cited by Westfield were inapplicable. The trial court accepted Westfield's position and granted the motion for summary disposition under MCR 2.116(C)(10) with-

---

[4] We shall discuss the specific policy provisions at issue in our analysis.

[5] By way of example, had plaintiff received $200,000 in settlement proceeds, Westfield would be agreeable to paying plaintiff $100,000 in UM benefits, assuming no notice and consent issues concerning the settlements and that plaintiff was legally entitled to recover compensatory damages from the uninsured motorists.

out reaching the issues of notice and consent concerning the three settlements. This Court subsequently granted plaintiff's application for leave to appeal.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND SUMMARY DISPOSITION PRINCIPLES UNDER MCR 2.116(C)(10)

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Kreiner v Fischer*, 471 Mich 109, 129; 683 NW2d 611 (2004). The proper interpretation of a contract, such as an insurance policy, is a question of law and likewise subject to review de novo on appeal. *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002).

MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. *Quinto v Cross & Peters Co,* 451 Mich 358, 362; 547 NW2d 314 (1996), citing MCR 2.116(G)(5). Initially, the moving party has the burden of supporting its position with documentary evidence, and, if the moving party does so, the burden then shifts to the opposing party to establish the existence of a genuine issue of disputed fact. *Quinto,* 451 Mich at 362; see also MCR 2.116(G)(3) and (4). "Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in [the] pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material

fact exists." *Quinto*, 451 Mich at 362. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. *Id.* at 363. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A court may only consider substantively admissible evidence actually proffered when deciding a motion for summary disposition under MCR 2.116(C)(10). *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999).

### B. PRINCIPLES GOVERNING INSURANCE CONTRACT INTERPRETATION AND UNINSURED MOTORIST BENEFITS

An insurance policy is subject to the same contract interpretation principles applicable to any other species of contract. *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005). Except when an insurance policy provision violates the law or succumbs to a defense traditionally applicable under general contract law, courts "must construe and apply unambiguous contract provisions as written." *Id.* "In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Id.* at 464. A court cannot hold an insurance company liable for a risk that it did not assume. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). When its provisions are capable of conflicting interpretations, an insurance contract is properly considered ambiguous. *Farm Bureau Mut Ins Co of Michigan v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999).

The no-fault act, MCL 500.3101 *et seq.*, guarantees personal protection insurance (PIP) benefits to victims of accidents in return for restrictions on a victim's ability to file a tort action, but it does not similarly guarantee residual-liability coverage, such as when a negligent driver is uninsured. *Husted v Auto-Owners Ins Co*, 459 Mich 500, 513; 591 NW2d 642 (1999). "Uninsured motorist coverage is not required by statute but may be purchased to provide the insured with a source of recovery for excess economic loss and noneconomic loss if the tortfeasor is uninsured." *Citizens Ins Co of America v Buck*, 216 Mich App 217, 224-225; 548 NW2d 680 (1996). In enacting the no-fault act, the Legislature divided an injured party's loss into two separate categories: first, loss for which the no-fault provider is liable and, second, loss for which a tortfeasor is liable. *Bradley v Mid-Century Ins Co*, 409 Mich 1, 62; 294 NW2d 141 (1980), overruled in part on other grounds *Wilkie v Auto-Owners Ins Co*, 469 Mich 41 (2003). "No-fault insurance provides security for the first type [of loss]; uninsured motorist coverage, which presupposes that the insured is entitled to recovery under the tort system, provides security for the second type [of loss]—it is offered to protect against being left with a worthless claim against an uninsured motorist." *Bradley*, 409 Mich at 62.[6]

With respect to UM benefits, our Supreme Court in *Rory*, 473 Mich at 465-466, made the following observations:

> Uninsured motorist insurance permits an injured motorist to obtain coverage from his or her own insurance

[6] In *Bradley*, 409 Mich at 62, our Supreme Court noted that the purpose of the no-fault act is to give a contractual right of action against a person's own insurer for wage loss and medical expenses, while a "tort action for non-economic and excess economic loss was preserved in cases of severe loss."

company to the extent that a third-party claim would be permitted against the uninsured at-fault driver. Uninsured motorist coverage is optional—it is not compulsory coverage mandated by the no-fault act. Accordingly, the rights and limitations of such coverage are purely contractual and are construed without reference to the no-fault act. [Citations omitted.]

### C. PROCEDURAL FRAMEWORK OF ACTION

It is appropriate to give some context to our discussion by setting forth the procedural framework generally applicable to litigation involving a claim for UM benefits and multiple tortfeasors.

In an action by an insured against an insurer to recover UM benefits, the litigation necessarily proceeds, to some degree, as a suit within a suit, in which the insured must prove the underlying liability or negligence of the uninsured motorist, causation, and damages, along with establishing the contractual liability of the insurer to pay the benefits under the relevant coverage provisions of the insurance policy. See *Rory*, 473 Mich at 465 (stating that UM benefits are available from an insurer to the extent that a permissible third-party claim against the uninsured at-fault driver exists); see also M Civ JI 36.15 (third-party tort actions, economic and noneconomic losses) and M Civ JI 67.17 (verdict form for economic- and noneconomic-loss claims for automobile negligence with comparative negligence). This concept is reflected in § A(1) of the UM-coverage endorsement in the case at bar, which states:

We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle." The damages must result from "bodily injury" sustained by the "insured" caused by an "accident." The owner's or driver's liability for these

damages must result from the ownership, maintenance or use of the "uninsured motor vehicle."

This case presents not only a situation involving a claim for UM benefits, but one in which there are also alleged multiple tortfeasors or persons at fault. MCL 600.2957(1) provides:

> In an action based on tort or another legal theory seeking damages for personal injury, . . . the liability of each person shall be allocated under this section by the trier of fact and, subject to [MCL 600.6304], in direct proportion to the person's percentage of fault. In assessing percentages of fault under this subsection, the trier of fact shall consider the fault of each person, regardless of whether the person is, or could have been, named as a party to the action.

See also MCR 2.112(K) (addressing notice requirements when raising claims of nonparty fault).

In an action seeking damages for personal injury involving the fault of more than one person, the trier of fact determines the total amount of the plaintiff's damages and the percentage of the total fault of all persons who contributed to the injury. MCL 600.6304(1). In allocating the percentage of fault, the trier of fact must consider the nature of the conduct of each person allegedly at fault and the extent of the causal connection between the damages claimed and the conduct. MCL 600.6304(2). In general, the trial court must set the damages award in the judgment in accordance with the fault allocations rendered by the trier of fact. MCL 600.6304(3). With some exceptions, a defendant's liability for damages is "several only and is not joint." MCL 600.2956. "These statutory provisions, included among the provisions referred to as the 'tort-reform statutes,' are designed to allocate fault and responsibility for damages among multiple tortfeasors."

*Kaiser v Allen*, 480 Mich 31, 37; 746 NW2d 92 (2008). A tortfeasor need not pay damages in an amount greater than his or her allocated percentage of fault. *Gerling Konzern Allgemeine Versicherungs AG v Lawson*, 472 Mich 44, 51; 693 NW2d 149 (2005). Under the fault-allocation statutes, a finding that a plaintiff suffered, for example, $100,000 in damages and that a defendant tortfeasor was 20 percent at fault would result in a judgment against that defendant in the amount of $20,000. See *Markley v Oak Health Care Investors of Coldwater, Inc*, 255 Mich App 245, 253; 660 NW2d 344 (2003), quoting *Smiley v Corrigan*, 248 Mich App 51, 55; 638 NW2d 151 (2001). The $20,000 represents the apportionment of the loss for which the defendant is responsible.

Any damages award in this case would be subject to reduction to reflect the combined fault of the two unidentified hit-and-run motorists unless 100 percent of the fault is attributed to them.

### D. DISCUSSION

Keeping in mind the principles governing appellate review, MCR 2.116(C)(10), insurance contract interpretation, and UM policies, along with the procedural framework, we now address the question concerning the proper treatment and the effect of the $332,500 in settlement proceeds in relation to both the UM coverage afforded under the policy and damages. Westfield maintains that the $300,000 in potential UM benefits must be reduced by the amount of the settlement proceeds, thereby leaving nothing owing under the policy, and plaintiff counters that Westfield must pay any damages in excess of $332,500, such as those the jury conceivably might assess at trial, subject to the $300,000 policy limit. Our analysis in resolving the

dispute requires review and construction of the contractual provisions of the UM endorsement. We shall address the six sections (A through F) found in the UM endorsement in sequential order, devoting the appropriate amount of attention to each section on the basis of its relevance to the issues presented. As part of our discussion, we will also address the secondary issue concerning notice of and consent to settlement with respect to the earlier litigation, which the trial court did not address. Westfield, citing and relying on §§ A(2) and C(1) of the UM endorsement, contends that plaintiff failed to satisfy these notice and consent provisions, excluding her from recovering UM benefits under the policy. Plaintiff asserts that Westfield waived this argument or is estopped from making it because Westfield denied coverage and walked out of court-ordered facilitation. Plaintiff also argues that the sections of the UM endorsement relied on by Westfield are inapplicable.

### 1. SECTION A OF THE UM ENDORSEMENT

Section A of the UM endorsement addresses coverage. Section A(1), as indicated earlier, merely provides that, on proof of bodily injury caused by an accident and liability arising out of the ownership, maintenance, or use of an uninsured motor vehicle, Westfield will pay benefits for sums that the insured is legally entitled to recover as compensatory damages from the driver or owner of the uninsured motor vehicle. Thus, § A(1) obligates Westfield to pay whatever damages plaintiff would have recovered from the owner or driver of an uninsured motor vehicle.

Section A(2) provides:

> With respect to damages resulting from an "accident" with a vehicle described in Paragraph **b.** of the definition of

"uninsured motor vehicle," we will pay under this coverage only if **a.** or **b.** below applies:

**a.** The limit [sic] of any applicable liability bonds or policies have been exhausted by payment of judgments or settlements; or

**b.** A tentative settlement has been made between an "insured" and the insurer of a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle" and we:

**(1)** Have been given prompt written notice of such tentative settlement; and

**(2)** Advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

The "vehicle described in paragraph **b.** of the definition of 'uninsured motor vehicle' " is, under § F(3)(b) of the UM endorsement, an "underinsured motor vehicle."[7] Therefore, § A(2) creates a prerequisite to recovering benefits for damages arising out of an accident with an underinsured motor vehicle. As indicated in the recitation of facts, however, plaintiff's complaint is devoid of any claim for benefits based on damages resulting from the accident as caused by the two underinsured drivers who had $100,000 liability policies. There is no allegation that either of the two underinsured drivers was negligent or liable. Rather, plaintiff's complaint focuses solely on the negligence and liability of the two unidentified hit-and-run drivers, the damages that they caused, and Westfield's failure to com-

---

[7] Section F(3)(b) provides that an

underinsured motor vehicle is a land motor vehicle . . . for which the sum of all liability bonds or policies at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged but that sum is less than the Limit of Insurance of this coverage[.]

pensate plaintiff for those damages.[8] Section A(2) is simply not implicated in this case. We therefore reject Westfield's arguments concerning plaintiff's alleged failure to give notice of settlement that rely on § A(2). Moreover, § A(2) does not suggest that the UM endorsement requires the policy limit to be reduced by the amount of settlement proceeds. Under § A(2), if an underinsured vehicle was at issue, the insured would be precluded from receiving any UM benefits unless the

---

[8] The complaint stated that, "[a]s a direct and proximate result of the negligence of the unknown operators of the minivan and black pick-up truck," plaintiff sustained injuries and damages. In the count directed specifically at Westfield, the complaint alleged:

30. That pursuant to the terms of the policy of insurance Plaintiff is entitled to uninsured motorist coverage since two of the vehicles causing the accident were driven by unidentified drivers and the vehicle was uninsured.

31. [Described the alleged negligence of the pick-up truck's driver]

32. [Described the alleged negligence of the minivan's driver]

33. That demand was made upon [Westfield] to pay damages caused by the unidentified operators of the minivan and black pick-up truck to Plaintiff pursuant to the provisions of the insurance policy and specifically those provisions protecting her from uninsured motorists.

34. That more than 30 days have elapsed and [Westfield] has refused, failed and/or otherwise breached its contractual duty to indemnify Plaintiff for her injuries and damages caused by the unidentified operators of the minivan and black pick-up truck.

We reject the argument that § A(2) applies merely because the accident factually involved two vehicles that fall within the definition of "uninsured motor vehicle" where the coverages applicable to them were less than the limits of insurance under the UM coverage. Plaintiff does not seek to recover under the UM coverage for any bodily injury caused by the drivers of the two underinsured vehicles. Because plaintiff does not seek coverage under § A(1) with respect to these drivers, the limitations on that coverage provided in § A(2) are irrelevant.

insured obtained a judgment or settlement in an amount that exhausted applicable underinsured policy limits or if the insured and the insurer of the underinsured vehicle reached a tentative settlement, with Westfield receiving prompt written notice of the settlement and making a timely advance payment to the insured in the amount of the tentative settlement. This language does not indicate that if the insured complied with these requirements, which would give the insured a right to UM benefits, the policy limit of the UM coverage would be reduced by the amount of the underinsured's exhausted policy (§ A[2][a]) or by the amount of Westfield's advance payment relating to a tentative settlement (§ A[2][b]).[9] Indeed, the language of § E(4) stating that advance payments will be separate from coverage amounts indicates the contrary, i.e., that no reduction occurs. See the discussion in part II(D)(5) of this opinion.

### 2. SECTION B OF THE UM ENDORSEMENT

This section defines who qualifies as an insured under the policy. Because there is no appellate issue regarding § B, and it has no bearing on the issues presented, it is unnecessary for us to construe this section.

### 3. SECTION C OF THE UM ENDORSEMENT

Section C of the UM endorsement addresses the topic of exclusions, and the only language debated by the parties is in § C(1), which provides:

---

[9] Section A(3) provides that "[a]ny judgment for damages arising out of a 'suit' brought without our written consent is not binding on us." There was no "judgment for damages," and neither party relies on this provision.

This insurance does not apply to any of the following:

**1.** Any claim settled without our consent. However, this exclusion does not apply to a settlement made with the insurer of a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle" [that being an underinsured vehicle], in accordance with the procedures described in Paragraph **A.2.b.**

This language indicates that UM coverage does not apply to a claim settled without Westfield's consent; however, plaintiff is seeking coverage only with respect to the two unidentified hit-and-run drivers, and there was no previous claim, or settlement, concerning these drivers. Thus, Westfield's argument regarding the need for consent under § C(1) is not viable under the facts of this case, and § C(1) does not support in any form or fashion Westfield's position that the settlement proceeds reduced the amount of available benefits. Westfield is attempting to read § C(1) much more broadly than the meaning expressed in the words of the section. It is evident that § C(1) governs situations in which an insured settles with an uninsured driver without Westfield's consent and thereafter sues Westfield for UM benefits related to the negligence of the settling uninsured driver. That is not the situation here, and Westfield will be free to pursue the unidentified drivers to recoup any damages that might be awarded to plaintiff under the UM coverage.

#### 4. SECTION D OF THE UM ENDORSEMENT (ANTI-DUPLICATION CLAUSE)

Section D of the UM coverage endorsement, which governs the limits of insurance, is the focus of plaintiff's appeal, and it provides in pertinent part:

**1.** Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved

in the "accident," the most we will pay for all damages resulting from any one "accident" is the Limit Of Insurance for Uninsured Motorists Coverage shown in the Schedule or Declarations.

**2.** No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form, any Liability Coverage Form, or any Medical Payments Coverage Endorsement attached to this Coverage Part.

We will not make a duplicate payment under this Coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

Section D(1) merely indicates that the most that Westfield would have to pay under the UM endorsement is the policy limit of $300,000, and plaintiff makes no claim that Westfield could be obligated to pay her more than $300,000 in UM benefits.

Section D(2) precludes an insured from receiving, and indicates that Westfield will not make, duplicate payments for the same elements of loss under multiple coverages under the policy or duplicate payments for any element of loss for which a legally responsible party has made a payment to the insured.[10] Although the phrase "element of loss" is not defined anywhere in the policy, the term "loss" is defined in the policy's general definition section as "direct and accidental loss or damage." The word "element" is not defined in the policy, but it is defined in the dictionary as "a component or constituent of a whole or one of the parts into which a whole may be resolved by analysis." *Random House Webster's College Dictionary* (2001).[11] Taking the

---

[10] We note that the first paragraph in § D(2) speaks of the "*same* elements of 'loss,' " while the second paragraph refers to "*any* element of 'loss.' " (Emphasis added.) Ultimately, this difference in drafting does not affect our analysis.

[11] If a term in an insurance policy is not defined in the policy itself, this Court gives the word its commonly understood meaning, which can be

policy definition of "loss" together with the dictionary definition of "element," we conclude that "element of loss" refers to a component of damages. In a personal injury case involving a motor vehicle accident, damages can be composed of economic damages covered by PIP benefits (generally known as first-party benefits),[12] excess economic damages not covered by PIP benefits, and noneconomic damages, which would include recovery for such items as past and future pain and suffering, inconvenience, physical impairment or disfigurement, mental anguish, fright and shock, denial of social pleasures and enjoyments, embarrassment, and humiliation. See MCL 500.3107, 500.3108, and 500.3135; *Bradley*, 409 Mich at 62; *Buck*, 216 Mich App at 224-225; M Civ JI 35.01 *et seq.*, 36.01 *et seq.*, 50.01 *et seq.*, and 67.01 *et seq.*[13]

---

accomplished by resort to its dictionary definition. *Brown v Farm Bureau Gen Ins Co of Michigan*, 273 Mich App 658, 662; 730 NW2d 518 (2007).

[12] PIP benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation," three years of work loss (with a cap on the monthly amount), expenses reasonably incurred in obtaining ordinary and necessary replacement services for a three-year period (with a cap on the daily amount), and survivor loss. MCL 500.3107 and 500.3108.

[13] MCR 2.516(D)(2) provides:

Pertinent portions of the instructions approved by the Committee on Model Civil Jury Instructions or its predecessor committee must be given in each action in which jury instructions are given if

(a) they are applicable,

(b) they accurately state the applicable law, and

(c) they are requested by a party.

However, the model instructions do "not have the force and effect of a court rule, and MCR 2.516(D) "does not limit the power of the court to give additional instructions on applicable law not covered by the model instructions." MCR 2.516(D)(1) and (4).

The word "duplicate" is also not defined in the policy, but the dictionary definition of the term, when used as an adjective, is "exactly like or corresponding to something else" or "consisting of or existing in two identical or corresponding parts; double." *Random House Webster's College Dictionary* (2001).

With these definitions in mind, the only reasonable construction of § D(2) is that the language prohibits an insured from receiving double payments for the same noneconomic and excess economic losses or damages; double-dipping (being paid twice for the same injury) is barred, preventing overcompensation for losses.[14] Because plaintiff has already received PIP benefits for economic damages, excess economic damages and noneconomic damages are the damages at issue. See *Bradley*, 409 Mich at 62; *Buck*, 216 Mich App at 224-225.[15] Further, the earlier tort action against the three drivers that led to settlement necessarily entailed, at most,

_____

[14] Although stated in a different context, our Supreme Court has noted: "Because the purpose of compensatory damages is to make an injured party whole for losses actually suffered, the amount of recovery for such damages is thus limited by the amount of the loss." *Rafferty v Markovitz*, 461 Mich 265, 271; 602 NW2d 367 (1999).

[15] M Civ JI 67.17 is the verdict form generally applicable to automobile tort claims for economic and noneconomic damages and indicates that only excess economic damages are recoverable if the tortfeasor was insured and that any economic damages are recoverable if the tortfeasor was uninsured. This is consistent with MCL 500.3135(3), which provides that

tort liability arising from the ownership, maintenance, or use . . . of a motor vehicle *with respect to which the security required by [MCL 500.3101] was in effect* is abolished except as to:

(c) Damages for allowable expenses, work loss, and survivor's loss . . . in excess of the daily, monthly, and 3-year limitations contained in [the PIP statutes]. [Emphasis added.]

noneconomic and excess economic damages, given the structure and nature of the no-fault act. See MCL 500.3135.

We are unable to discern from the record whether the settlement proceeds were meant to compensate plaintiff for excess economic losses, noneconomic losses, or a combination of the two, let alone place a dollar amount on each form of damages. Assuming liability, the jury would generally make separate determinations of the amount of excess economic damages and noneconomic damages. See M Civ JI 67.17. Because the settlement agreements contained no allocation of loss between excess economic damages and noneconomic damages; because plaintiff does not argue that the element of loss, i.e., component of damages, should be categorized in increments beyond a single component of noneconomic damages/excess economic damages; and because Westfield's benefits-reduction argument also implicitly groups noneconomic damages/excess economic damages as the relevant element of loss, we shall treat the settlement proceeds as a lump-sum element of loss for comparison with a potential jury award, which shall also be treated as a lump sum. Thus, if the jury ultimately awards plaintiff $332,500 or less, regardless of how the jury apportions excess economic damages and noneconomic damages in its verdict, Westfield cannot be held liable for any UM benefits under the policy because that would result in duplicate or double payments for the same element of loss (double-dipping) and overcompensation of the plaintiff's injuries. However, should plaintiff establish liability and the jury return a verdict finding damages in an amount in excess of $332,500, regardless of how the damages are allocated between excess economic damages and noneconomic damages, a judgment ordering Westfield to pay UM benefits for some or all of the excess within the confines of the

policy limit would not offend § D(2) because a duplicate or double recovery would not occur. Westfield would have to pay the difference between the $332,500 in settlement proceeds and the total damages award, up to the policy limit of $300,000 and subject to any fault allocation.[16] Plaintiff would not be receiving double payments for the same element of loss, but would instead be receiving an award making her whole without duplication. Accordingly, merely because plaintiff has received more than $300,000 in settlement proceeds does not mean that a judgment against Westfield would involve duplicate payments. Rather, only if a jury determines that plaintiff is entitled to $332,500 in damages or less can the trial court definitely declare that Westfield is not liable for any amount under the insurance contract because to so hold it liable would result in plaintiff's receiving a duplicate payment for the same element of loss. We find no language in § D(2) that can be construed to support Westfield's position that the

---

[16] At first glance, our system requiring the allocation of fault, as discussed earlier, could be viewed as complicating matters in this case. By way of example, while still considering the settlement disbursement of $332,500, if a jury were to find that plaintiff suffered $500,000 in damages and attributed 20 percent fault to the unidentified motorists, only a $100,000 judgment could be entered against Westfield. We wish to make abundantly clear that in determining whether a duplicate payment would be made in such a situation, the trial court must consider the overall damage total ($500,000), not the fault-allocated amount ($100,000), and compare it against the $332,500 in settlement proceeds. Even though the $100,000 fault-allocated damages judgment would be less than the settlement proceeds, a judgment ordering Westfield to pay $100,000 would not result in plaintiff's receiving a double recovery for her losses or a windfall, which is what § D(2) prohibits. Plaintiff would not be overcompensated because she would be paid a grand total of $432,500 (settlement proceeds of $332,500 plus $100,000 for the allocated judgment), while suffering a $500,000 loss. Westfield would still retain the benefit of not having to pay the remaining $67,500 in losses because of fault allocation.

$300,000 in available UM benefits must be reduced by the amount of the settlement proceeds.

Westfield appears to suggest that, because plaintiff received settlement proceeds for both excess economic damages and noneconomic damages, she would be paid a second time for those damages if a damages award were assessed against Westfield; therefore, there would be a violation of the anti-duplication language in § D(2). There is, however, a difference between a second payment and a duplicate or double payment, the former not necessarily entailing overcompensation for the same loss and the latter entailing overcompensation and double recovery for the same loss. Westfield's position would also be contrary to its own recognition that if settlement proceeds are less than the policy limit, further payments under the UM policy might be appropriate. Moreover, Westfield's interpretation of § D(2) is inconsistent with numerous cases from other jurisdictions in which courts were confronted with comparable anti-duplication language.[17]

In *Grayer v State Farm Ins Co*, 611 So 2d 762, 764 (La App, 1992), the Louisiana Court of Appeal distinguished anti-duplication clauses from reduction clauses, ruling:

> In our opinion the above policy language[18] is different from the language in [the cases discussing clauses]. In those cases the policies provide that "the amount pay-

---

[17] We acknowledge that there are some cases that support Westfield's position, e.g., *Imre v Lake States Ins Co*, 803 NE2d 1126 (Ind App, 2004); however, we find the reasoning in those cases unpersuasive.

[18] The policy language in *Grayer*, 611 So 2d at 764, provided that "no one will be entitled to receive duplicate payments under this coverage for the same element of loss which were paid because of the bodily injury or property damage by or on behalf of persons or organizations who may be legally responsible." This language is virtually identical to the language in the UM endorsement at issue here.

able ... shall be reduced by an amount equal to total limits of liability" ... and "any amounts ... payable ... shall be reduced by all sums paid. ..." ... In each instance the language directs that the *coverage* (i.e. amounts payable) are to be reduced by either the liability coverage available or the amounts actually paid. In the instant case the language prohibits duplicate *payments.* It does not provide for a reduction in coverage, only that the insured will not be paid twice for the same injuries. This is different than reducing the available coverage. For example, if John Jackson's injuries are worth $100,000.00, he should be entitled to receive the full UM coverage available, i.e. $20,000.00, which would give him a total recovery of $28,500.00[, considering the earlier $8,500 payment from Allstate]. However, if his total injuries are $5,000.00, he would not receive any UM payment from State Farm because he has already been full [sic] paid (i.e. the $8,500.00 Allstate paid) for his injuries. That is the purpose of State Farm's policy language, to prevent duplicate payments, not reduce coverage. [Emphasis in original; citations omitted; deletions within quotations in original.]

The Nevada Supreme Court similarly distinguished anti-duplication clauses, comparable to the one in our case, from reduction clauses in insurance policies. *St Paul Fire & Marine Ins Co v Employers Ins Co of Nevada,* 122 Nev 991; 146 P3d 258, 263 (2006) (holding that the anti-duplication clause merely limited the coverage available to an injured party to elements of loss not already covered by a workers' compensation insurer, whereas the reduction clause required reduction in the amount of insurance coverage available for amounts paid in workers' compensation benefits); see also *Greenfield v Cincinnati Ins Co,* 737 NW2d 112, 117-118 (Iowa, 2007).

In *Fischer v Midwest Security Ins Co,* 268 Wis 2d 519, 531-533; 673 NW2d 297 (Wis App, 2003), the Wisconsin Court of Appeals, also addressing a comparable anti-duplication clause, rejected the insurer's argument that

recovery by the plaintiffs pursuant to an underinsured vehicle endorsement would constitute a duplicate payment when the plaintiffs had already recovered the maximum limit under their UM coverage. The court explained:

> A plain reading of [the anti-duplication clause] leads one to expect that a "duplicate payment" would be one where both a tortfeasor and an insurer compensate the insured for the same element of loss. [The provision] guards against profiting beyond the damages actually incurred. [*Id.* at 532.]

We are addressing an anti-duplication clause and not a reduction-in-benefits clause; therefore, we agree with plaintiff that § D(2) only precludes her from a double recovery for the same loss.

### 5. SECTION E OF THE UM ENDORSEMENT

Section E changes the conditions of the UM coverage. The first paragraph of § E(4) plays a prominent role in, and is the focus of, Westfield's arguments.

Section E(4) addresses the transfer of rights of recovery against others to Westfield. Section E(4) provides, in part, that if Westfield "make[s] any payment and the 'insured' recovers from another party, the 'insured' shall hold the proceeds in trust for [Westfield] and pay [Westfield] back the amount [it has] paid." This language is somewhat more difficult to decipher than the language in § D(2). We conclude, however, that the language in § E(4) has no bearing on the issue presented.

Under § E(4), if Westfield had made an advance payment to plaintiff to the full extent of the policy coverage, $300,000, before plaintiff received any settlement proceeds, once plaintiff received the settlement

payments, the contractual provision would require plaintiff to return the $300,000 advance payment to Westfield, leaving plaintiff with $332,000 in settlement proceeds and leaving Westfield without a penny lost. That is the full import of the language at issue in § E(4). It does not suggest that the policy limit would be permanently exhausted under our hypothetical example and that plaintiff could no longer make a claim for UM benefits should she have actual damages exceeding the amount of the settlement proceeds. While one might, through excessive and implicit extrapolation of the contractual language, reach a contrary conclusion, it would offend the plain language of § E(4) to equate it to a reduction-of-benefits clause. Ultimately, § E(4) plays no role in analyzing this case. Rather, § E(4) is simply a mechanism by which Westfield can recoup advance payments, which would never total more than the $300,000 policy limit, if the insured has received any amount up to $300,000 from third parties. It does not answer the question of what occurs in a situation in which the insured suffers damages beyond the proceeds received from legally responsible parties; rather, § D(2) answers that question. The language in § E(4) cannot reasonably be interpreted as requiring a dollar-for-dollar reduction in the policy limit and available benefits equivalent to the settlement proceeds received by plaintiff when damages are greater in amount than the settlement proceeds.

Moreover, "[c]ourts should attempt to harmonize all parts of a contract of insurance so as to give effect to each clause contained therein." *Murphy v Seed-Roberts Agency, Inc*, 79 Mich App 1, 8; 261 NW2d 198 (1977), citing *Jackson v British America Assurance Co*, 106 Mich 47; 63 NW 899 (1895). In *Associated Truck Lines, Inc v Baer*, 346 Mich 106, 110; 77 NW2d 384 (1956), our

Supreme Court, quoting *Laevin v St Vincent de Paul Society of Grand Rapids*, 323 Mich 607, 609-610; 36 NW2d 163 (1949), stated:

> " ' "It is a cardinal principle of construction that a contract is to be construed as a whole; that all its parts are to be harmonized so far as reasonably possible; that every word in it is to be given effect, if possible; and that no part is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable." ' "

Furthermore, in *Wilkie*, 469 Mich at 50, the Michigan Supreme Court, construing an insurance policy, concluded that any perceived ambiguity in a certain paragraph of the policy was eliminated by the language in later paragraphs, which must all be read together.

To interpret § E(4) as standing for the proposition argued by Westfield, that the policy benefits must be reduced by the amount of the settlement proceeds, would run afoul of these contract construction principles. When § E(4) is read in conjunction and harmony with § D(2), it becomes abundantly clear that § E(4) is, in essence, precluding a double recovery for the same injury, just like § D(2), by making an insured return up to $300,000 in advance payments to Westfield when the insured subsequently recovers that amount from another party. As indicated above, § D(2) does not allow an insured to receive duplicate payments for the same element of loss, but if § E(4) is construed as suggested by Westfield, the anti-duplication principle of § D(2) is rendered meaningless. Section D(2) necessarily stands for the proposition that an insured *is entitled* to UM benefits unless an award of benefits would result in a double recovery for the same loss. If § E(4) is read to mean that any payment by a legally responsible party to the insured is setoff against or reduces the $300,000 in coverage, it would directly conflict with § D(2) because

such an interpretation would indicate that an insured *may not be entitled* to UM benefits even if a double recovery failed to occur.[19] As argued by plaintiff, it is § D, not § E, that governs the limit of the UM benefits.

Our interpretation still gives meaning to § E(4) and results in that section complementing § D(2). Section D(2) prevents an insured from receiving a double recovery from Westfield on a loss for which compensation was already received from a legally responsible party. And § E(4) demands that the insured return any payments advanced by Westfield under the UM endorsement should the insured recover a payment covering the loss for which Westfield had made the advanced payment, subject to a subsequent claim for UM benefits should damages exceed the settlement proceeds.

We also call attention to additional language in § E(4) concerning damage caused by an accident with an underinsured vehicle, which provides:

> If we advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification:
>
> **a.** *That payment will be separate from any amount the "insured" is entitled to recover under the provisions of Uninsured Motorists Coverage;* and
>
> **b.** We also have a right to recover the advance payment. [Emphasis added.]

This language indicates that if an insured reached a tentative settlement with an underinsured driver for

---

[19] By way of another example, if an insured suffered $500,000 in damages, with a UM policy limit of $300,000, received settlement proceeds amounting to $300,000, and there was no issue of fault allocation, § D would dictate that the insured could recover $200,000 in UM benefits, but under Westfield's interpretation, § E(4) would dictate that no UM benefits are recoverable. Under Westfield's construction, § D serves no purpose, as it would be swallowed up by § E(4).

$50,000 and gave the appropriate notice to Westfield, and if Westfield then made an advance payment of $50,000 to the insured, Westfield would be entitled to repayment of the $50,000 when the settlement was paid to the insured, but the insured would still be able to recover the full and separately treated $300,000 under the UM coverage, assuming liability and a sufficient amount of damages, because, in essence, Westfield, rather than the insured, received the $50,000 from the third party. In the end, the insured would have recovered $350,000 ($300,000 under the UM coverage, $50,000 settlement proceeds, $50,000 advanced payment from Westfield, less $50,000 repaid to Westfield). Thus, the $50,000 is not an offset that reduces the $300,000 in UM coverage, but represents compensation in addition to the $300,000 in UM benefits. This is consistent with our interpretation of the first paragraph in § E(4) and conflicts with the underlying theme of Westfield's argument.

### 6. SECTION F OF THE UM ENDORSEMENT

Section F governs the definition of terms used in the UM endorsement that we referred to earlier in this opinion. There is no need to further explore this section.

### 7. MICHIGAN CASES AND REDUCTION CLAUSES

Contrary to Westfield's argument, the insurance policy does not call for a reduction in benefits payable under the UM endorsement in an amount equal to any payments made by legally responsible parties. The Michigan cases holding that a benefit reduction occurs when payments are made by legally responsible parties are easily distinguished, given the clear reduction language in the policies.

In *Schroeder v Farmers Ins Exch*, 165 Mich App 506, 508; 419 NW2d 9 (1987), the insurance policy provided: "The amount of bodily injury coverage provided under the Uninsured Motorists Coverage of this policy shall be reduced by the amount of any other bodily injury coverage available to any party held to be liable for the occurrence."

In *Parker v Nationwide Mut Ins Co*, 188 Mich App 354; 470 NW2d 416 (1991), the plaintiff's decedent died in a car crash, and the plaintiff filed suit against and settled with the operator of the vehicle that struck the decedent and the dramshop that served the driver in the amounts of $20,000 and $160,000, respectively. The decedent also had a no-fault policy with the defendant insurer that included endorsements providing UM and underinsured motorist coverage equaling $100,000, and the plaintiff filed suit against the insurer after the settlements were entered. This Court affirmed the trial court's order granting summary disposition in favor of the insurer on the basis of a setoff provision, which provided that the

> limits of this coverage and/or any amounts payable under this coverage will be reduced by:
>
>> a. any amount paid by or for any liable parties. [*Id.* at 355.]

This Court concluded:

> Because the total amount received by plaintiff from both the driver and the dramshop exceeded the policy coverage, the trial court did not err in finding that defendant was entitled to summary disposition pursuant to the setoff provision of the underinsured motorist endorsement. [*Id.* at 357.]

Here we do not have a comparable setoff or reduction provision, and the policy militates against any finding that a benefit setoff or reduction is proper.

In *Erickson v Citizens Ins Co*, 217 Mich App 52; 550 NW2d 606 (1996), and *Mead v Aetna Cas & Surety Co*, 202 Mich App 553; 509 NW2d 789 (1993), this Court addressed the question whether proceeds received by the insured from third parties should be offset against the total amount of damages or against the amount of the UM coverage. Both panels held that such proceeds should be offset against the coverage limit and not the total amount of damages pursuant to the clear and unambiguous language of the insurance policies. *Erickson*, 217 Mich App at 55,[20] *Mead*, 202 Mich App at 555-556. The insurance policy language at issue in *Erickson* provided:

> Any amounts otherwise payable for damages under this coverage shall be reduced by all sums:
>
> 1. Paid because of the "bodily injury" by or on behalf of persons or organizations who may be legally responsible. [*Erickson*, 217 Mich App at 54.]

The language at issue in *Mead* was essentially identical to that in *Erickson*. *Mead*, 202 Mich App at 555.

Again, we do not have comparable reduction or setoff language here. Section E(4) and the anti-duplication language found in § D(2), which precludes a double recovery for the same element of loss, as well as the contract in general, do not state in any form or fashion that the amount payable under the coverage must be reduced by sums paid because of bodily injury by legally responsible parties. If this is what Westfield intended, expressing this intent in the policy was not accomplished.

---

[20] The *Erickson* panel did not allow a complete offset against the policy limit, concluding that some of the proceeds provided to the plaintiff were not made "by or on behalf of persons or organizations who may be held legally responsible." *Erickson*, 217 Mich App at 55 (emphasis omitted).

In sum, we hold that Westfield's liability and obligations under the UM coverage depend on the extent of any damages found by the jury, if indeed the jury rules in plaintiff's favor. Accordingly, the trial court erred in granting summary disposition in favor of Westfield.

### III. CONCLUSION

We hold that there is no language in the policy supporting the trial court's benefits-reduction ruling and that the language in the UM endorsement dictates that any offset pertains only to duplicate payments for the same noneconomic and excess economic losses. Westfield would be liable for UM benefits equivalent to the difference by which any overall damages award exceeds the sum of the settlement proceeds, subject to the policy limit and any allocation of fault determined by the trier of fact. Because plaintiff's entitlement to coverage and damages has not yet been decided, nor damages assessed, and because she could conceivably receive damages exceeding the amount of the settlement proceeds, the trial court erred in granting summary disposition. Finally, Westfield's notice and consent arguments fail because the sections of the UM endorsement cited are inapplicable under the facts of the case.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.